[No. S050082. July 2, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER ADAM GEIER, Defendant and Appellant.

**COUNSEL**

Michael J. Hersek, State Public Defender, and Barry P. Helft, Chief Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Mary Jo Graves, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, William M. Wood, Holly Wilkens and Andrew S. Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—Defendant Christopher Adam Geier was convicted by a jury of the forcible rape of Erin Tynan (Pen. Code, § 261, subd. (a)(2)), the murder of Erin Tynan (Pen. Code, § 187, subd. (a)), as to which a felony-murder special circumstance was found to be true (Pen. Code, § 190.2, subd. (a)(17)), two counts of conspiracy to commit murder (Pen. Code, §§ 182, subd. (a)(1), 187), and the murder of Curtis James Dean (Pen. Code, § 187, subd. (a)), as to which financial gain, lying-in-wait and multiple-murder special circumstances were found to be true (Pen. Code, § 190.2, subd. (a)(1), (3), (15)). Defendant was also convicted of conspiracy to murder Gail Lebouef (Pen. Code, §§ 182, subd. (a)(1), 187). The jury also found true special allegations that defendant personally used a knife and a handgun in the commission of the offenses. (Pen. Code, §§ 12022, subd. (b), 1203.06, subd. (a)(1).) The jury returned death verdicts for the murders of Erin Tynan and Curtis James Dean. The trial court declined to modify the verdict (Pen. Code, § 190.4, subd. (e)), and sentenced defendant to death on the murder counts.[1] This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)

We affirm the judgment.

## I. FACTS

### A. *Prosecution Guilt Phase Evidence*

#### 1. *The Rape and Murder of Erin Tynan*

In 1990, Erin Tynan was a military police officer stationed at Fort Irwin in Barstow. In the spring and summer of 1990, Tynan was romantically involved with William Jones, Jr., who was also in the Army. When Jones and Tynan had sexual relations, she used a sponge contraceptive. According to Jones, Tynan, who was Caucasian, had a preference for muscular African-American men like Jones. Jones also described Tynan as a person who cared about her appearance. As part of her grooming routine she kept her fingernails in good shape and would regularly change their color.

Jones was acquainted with defendant, who is Caucasian, and who was also in the Army and stationed at Fort Irwin. At some point, Jones bought a Jennings .22-caliber semiautomatic pistol from defendant. The pistol was in

---

[1] Defendant was also sentenced to eight years in prison, with a one-year weapons enhancement on the forcible rape count, and two terms of 25 years to life on the conspiracy counts, with additional terms of two years and one year for the weapons enhancements.

All further unspecified statutory references are to the Penal Code.

pretty poor condition. There was something wrong with the firing pin that created a problem with the ejection of the cartridge after the gun was fired.

Jones left the Army in late July, 1990, but remained in Barstow until the beginning of August. Before he left Barstow, Jones attended a party with Tynan at the apartment complex in which defendant lived. Defendant was present at the party. Defendant had been acquainted with Tynan before the party and had once told Jones that if he had seen Tynan first "he would have been with her." Jones understood this to mean that defendant wanted to have sex with Tynan.

When Jones left California in August 1990, he left with Tynan the pistol he had bought from defendant. When he spoke to her in October, she told him she wanted to get rid of the gun and had a buyer. He told her to sell it. Robert Bishop, an Army sergeant, who had a dating relationship with Tynan in the fall of 1990, saw a .22- or .25-caliber semiautomatic pistol at her apartment. She kept the gun in her closet and brought it down to show him. Anthony Brunson, another soldier stationed at Fort Irwin, contacted Tynan in late September or mid-October about buying the pistol that Jones had left with her. He had approximately four conversations with her about the gun and was trying to raise the money to purchase it up until the time of her death in November.

Eugene Knox, a soldier stationed at Fort Irwin, began dating Tynan in November 1990. He spent the night of November 13 with Tynan and they engaged in sexual intercourse. The next morning they both went to work at Fort Irwin. Knox last saw her sometime after 12:30 p.m. that afternoon. At 5:42 p.m., Robert Bishop called Tynan from Fort Irwin and asked her if he could come and see her. She told him no because she was tired and wanted to go to bed. About 8:00 p.m., Joni Lee Jacobsen was visiting her friend, Jesse Hisquierdo, who lived in the apartment adjacent to Erin Tynan's apartment. She and Hisquierdo were watching television when, about 8:30 p.m., she heard a woman scream in the next apartment. A few seconds later she heard a thump "like someone running into the wall" or "bumping into the wall." She assumed the people next door were "partying" and did not investigate.

The next day, November 15, Tynan failed to report for duty. About 3:00 p.m., a Barstow police officer, Alan Schieb, was dispatched to her apartment to check up on her. When he arrived he saw that the lights were on inside the apartment and the television was playing rather loudly. The door was locked. He knocked at the door, but received no response. Schieb left and returned two hours later with Sergeant Beringer, a military police officer. Shortly after 5:00 p.m., the apartment manager let them into Tynan's apartment. Schieb observed that the dead bolt was not locked, only the doorknob lock. The

living room did not appear to be disturbed. Schieb and Beringer went into the bedroom and turned on the light. They found Tynan's body lying on the bed. She was clad in a turquoise-colored housecoat that was open, exposing her breasts. A sheet was pulled up to her navel. Schieb called the police dispatcher and asked for the paramedics and detectives to be alerted.

Detective Leo Griego arrived at scene in response to Schieb's call. Griego determined there had not been a forcible entry into the apartment. On the dining room table he observed bottles of nail polish and polish remover spread out on a cloth mat. He also found a wallet with Tynan's identification, credit cards and some cash. There were no indications that a struggle had taken place in the apartment. In the kitchen, Griego found two pots on the stove, one containing noodles and the other broccoli. The food was reasonably fresh. In the bathroom he found two empty containers for sponge contraceptives in the wastebasket, but no contraceptives.

Griego went into the bedroom and examined Tynan's body. He observed that the fingernail on her right-hand ring finger was broken off and that strands of hair were embedded in the other nails of her right hand. The fingernails of her left hand were also damaged and hair was found in the fingertip area of her left hand. A pair of panties was found rolled up on the carpet. Tynan was not wearing anything other than the housecoat. Detective Griego observed that Tynan had suffered various injuries including discoloration to her left eyebrow, abrasions and bruises around her knees and blood smears around her left ear and a puncture wound in the same area. Griego initially believed the puncture was a gunshot wound but later concluded it was a stab wound. There was also blood on her foot. There was moist blood on the carpet and on the bedsheet. Griego found a .22-caliber cartridge on the top shelf of the bedroom closet, but no gun.

Tynan's body was examined by Pathologist Edward Yeager. He testified that the stab wound behind Tynan's ear had partly severed her carotid artery. He also found injuries to Tynan's head, neck, upper torso and legs, and observed an "impact abrasion" on her forehead. Yeager observed an abrasion to her anus but found no evidence of vaginal tearing or abrasion. The absence of such injuries, however, did not in his opinion preclude nonconsensual sexual activity. According to Yeager, the cause of death was the stab wound and manual strangulation.

Police criminalists removed various items from the bedroom and from Tynan's body for testing. The strands of hair embedded in her fingernails were collected for microscopic analysis by forensic serologist David Vreland. Vreland concluded that seven of the hairs found in Tynan's hand could have

come from defendant.[2] David Gregonis, a sheriff's criminalist, collected forensic samples from Tynan's body, including pubic hairs and vaginal and rectal swabs. Seminal fluid was detected on the vaginal swab and it was submitted for DNA testing. That testing revealed that the DNA matched defendant's DNA. DNA testing on a piece of Tynan's bedsheet that contained semen revealed that the DNA banding pattern was consistent with Eugene Knox's DNA. Other seminal fluid found on the comforter did not match defendant's DNA.

Rhonda Contreras lived with Sue Kennedy, defendant's girlfriend at the time of the Tynan murder. Contreras, a drug addict, testified that shortly after Tynan's murder she heard defendant say "the bitch had gotten what she deserved." Defendant said that Tynan was "kind of sleazy" and that, had she been his girlfriend, he would not have put up with her behavior. He told Contreras that Tynan had been brutally beaten and stabbed in the back of the neck or head, information that had not yet appeared in the press. Geier was cleaning a semiautomatic pistol while he made these comments and referred to the gun as his "baby." James Winstein, a fellow Fort Irwin soldier who was involved in the conspiracy to murder Gail Lebouef (see *post*), testified under a grant of immunity that, in December 1990, defendant told him he had murdered Tynan.

### 2. *The Conspiracy to Murder Gail Lebouef*

Gail Lebouef was the ex-wife of Jeffrey Hunter, defendant's sergeant at Fort Irwin; the two divorced in September 1989. She and Hunter remained in touch after the divorce. In December 1990, Lebouef was living in Marrero, a suburb of New Orleans, with her two daughters from her marriage to Hunter. During the marriage, Hunter had purchased life insurance policies on Lebouef and their children. He continued to pay the premiums on the policies after the divorce. He was the beneficiary of the policy for Lebouef. Lebouef was aware that Hunter was experiencing financial problems and at least one of his creditors had contacted her about Hunter's unpaid credit card bill. Hunter had also told her he was concerned about whether he could make child support payments scheduled to begin in 1991 or 1992, after he had paid off her car.

Lebouef had been living with her parents but, due to disagreements with them, she accepted the invitation of Hunter's sister, Robin Castle, to stay at Castle's home over the holidays. She and one of her daughters moved into Castle's house sometime in mid-December. Hunter was aware that his ex-wife was staying with his sister. He also knew that she worked at a toy store in a shopping mall.

---

[2] Vreland also examined hairs taken from Louis Boyd, Eugene Knox, Robert Bishop, Kelvin Sloan, and Michael Rivera, men who apparently may also have been involved with Erin Tynan. Vreland determined that none of the hairs came from any of these men.

James Winstein was a tank gunner in the same battalion as defendant.[3] In late November or early December, defendant offered to pay Winstein $1,000 if Winstein would drive him to Alabama to visit his parents. After some further conversations, defendant confided to Winstein that his real purpose was to go to New Orleans to commit a murder for someone for insurance money. He wanted Winstein to drive him to New Orleans. He told Winstein he would pay him from defendant's share of the insurance proceeds. After Winstein agreed, defendant provided more information about the murder, including showing Winstein a photograph of the victim, Gail Lebouef. He told Winstein he had obtained the photograph from Hunter. Lebouef's photograph was in a suitcase that also contained a double-edged black knife, a nine-millimeter pistol, a .22-caliber semiautomatic pistol, rope and a road atlas in which he had highlighted a route to New Orleans. Defendant told Winstein that defendant planned to break into Lebouef's residence in the middle of the night and kill her, making it look like a burglary. Winstein's job would be to wait in the car and drive defendant away after he committed the murder.

The two men left California on December 18, 1990, and arrived in New Orleans on December 20. Defendant had in his possession a black gym bag containing the knife, firearms, rope, a map and a change of clothes. Once they arrived in New Orleans, they went back and forth between Lebouef's parent's house and the mall where she worked, looking for her car, eventually locating it at the mall. Defendant wanted to kill Lebouef in the parking lot of the mall, but Winstein objected that this was not the agreed-upon plan. Eventually, they decided not to kill her at the mall. That evening, they returned to Lebouef's parent's house looking for her car. When they did not find it, defendant telephoned Hunter, who gave him directions to Robin Castle's home. They drove by the house but, from the number of cars and people on the street, they thought there might be a party, so they decided to return later.

Gail Lebouef and her oldest daughter arrived at the Castle residence about 10:00 p.m. They occupied the back bedroom of the house. Lebouef went to bed around midnight. About 3:00 a.m., defendant and Winstein returned to Castle's residence and parked. Defendant, dressed in dark clothing, exited the truck with the .22-caliber pistol, a knife and rope. Lebouef was awakened about 3:30 a.m. when the bedroom light was turned on. A gun was pointed at her face by a man she saw in silhouette. He fired the gun, shooting her in the face. Although she survived, she lost four teeth and suffered damage to her jawbone and her face. Lebouef's purse, containing approximately $400 in cash, was taken from the residence.

---

[3] Winstein testified under a grant of immunity.

Winstein had fallen asleep in his car. At some point, he heard defendant's footsteps coming quickly toward the car and then saw him running. He jumped into the car and said, "Let's go, let's go, let's go." They sped off. Defendant had a black purse in his possession from which he gave Winstein $30 or $40. As they drove north, they crossed a bridge. Defendant tossed the purse, his clothes and the gun over the side of the bridge. Defendant described to Winstein how he had entered the house and shot Lebouef. He said that the gun had jammed on him after he had fired the first round. He told Winstein he had killed Lebouef. After they returned to California, however, defendant told Winstein that she had not died and there would be no insurance payoff.

Subsequently, Lebouef spontaneously identified defendant as the shooter from a photograph of him in a newspaper article about the Curtis James Dean murder (*post*) sent to her at her request by Detective Griego She also identified him as her assailant at the preliminary hearing.

A .22-caliber cartridge case and a fragment of a .22-caliber projectile bullet were recovered from the bedroom where Lebouef was shot. William Blondet, the firearms examiner, testified that there was a "good likelihood" the bullet had been fired from a Jennings .22-caliber handgun. He also opined that the gun was a poor quality weapon and could have jammed if there was difficulty in chambering a round after the weapon had been fired once and the casing ejected.

3. *The Conspiracy to Murder, and the Murder of, Curtis James Dean*

Curtis James Dean lived with his wife, Jennifer, and their two small children in Victorville. Sometime in late 1990, Jennifer Dean told a coworker that she and her husband were having marital problems. Another coworker heard Jennifer Dean say more than once that she hated her husband and wanted him dead. Around the same time, Jennifer Dean began having an affair with Jeffrey Hunter.

On January 11, 1991, defendant approached James Winstein and told him that a female friend of Hunter's who lived in Victorville wanted her husband dead. Defendant told Winstein that if he participated in killing the man, they would receive insurance money from the policy on the man's life. Winstein was to provide the transportation. The killing was supposed to take place within the month. Although defendant asked him to participate several times, Winstein turned him down.

On the night of February 7, 1991, Jennifer Dean went to her job at a Taco Bell but, according to a coworker, spent most of her shift talking on the telephone. Another coworker testified that she was acting as if "something was wrong." She left the Taco Bell around 2:00 a.m.

Around 2:30 a.m., Jennifer Dean's neighbor, Deborah Benson, received a call from Dean. Dean told Deborah Benson that she had just arrived home from work and could not find her husband in the house. She said she thought her husband might be sick because she "saw something on the wall." Dean also said some things in her bedroom were in disarray and that the house may have been burglarized. Deborah Benson woke her husband, Scott, told him about the call, and asked him to go check on Dean.

Scott Benson drove the short distance to the Deans' residence and met Jennifer Dean at her front door. Dean spoke in a very "matter of fact" voice and did not appear to be agitated or afraid. She told Benson that her house had been burglarized and was in disarray. When Benson entered the house, however, it did not appear to be in disarray or to have been burglarized. Benson walked through the house. The Deans' daughters were asleep in the master bedroom. As Benson moved down the hallway accompanied by Dean, he saw blood on the wall and in the guest bathroom, near the light switch. He entered the children's bedroom and found the body of Curtis James Dean on the floor between the two twin beds in what Benson described as a "fetal position." There were "vast amounts" of blood on the bed, floor and wall. He closed the door, went to the kitchen and called 911.

Jennifer Dean was present as he told the 911 operator about what he had found. She did not react or speak. Because he did not know whether Curtis James Dean was dead or alive, Benson went back into the bedroom, knelt by the body and tried to find a pulse, but was unable to do so. He observed numerous stab wounds to the body. He returned to the kitchen, got back on the line with the 911 operator, and told her that "it appeared that we had a death." Again, Jennifer Dean did not react.

Later, after the police arrived, Scott Benson took the Deans' two small children to his house. When they arrived at his house, Sabrina, the older child said something about "the two mean men that killed her daddy," or "the two mean men that hit her daddy." At a later point, Benson, Jennifer Dean, and the children were driven to the sheriff's station in a police car. While they were in the patrol car, Sabrina repeated her comment "about the two mean men that hurt her daddy." The transporting officer, Deputy Gryp, also heard Sabrina tell her mother that "she saw daddy bent over in a pool of blood in the bedroom." While they were at the station, Benson noticed blood smears

on Sabrina's nightgown and her leg. Gryp also saw the blood spatters and heard Sabrina complain about a bump on her head.

The police investigation revealed no signs of forced entry into the Dean residence or signs that the residence had been ransacked. A great deal of blood was found inside and outside the Dean residence. Two drops of blood found on the cement in front of the house were later determined to be consistent with defendant's blood. Blood found on a green hand towel left on the floor outside the children's bedroom was also consistent with defendant's blood, as was blood found on the bathroom floor, bedroom doorjamb and on the hallway carpet. Much of the rest of the blood found in the house, including the blood found on Sabrina's nightgown was consistent with Curtis James Dean's blood. The blood spatters on Sabrina's clothing indicated she was less than five feet from her father when he was stabbed. Curtis James Dean suffered 38 knife wounds, including a series of wounds that appeared to have been inflicted after his death.

Police later recovered items belonging to Jennifer Dean from the apartment of friends where she often stayed. Among those items was a paper place mat from Taco Bell with defendant's name and a telephone number written on it. Police also obtained Dean's bank records. They showed a $500 cash advance on January 17, 1991.

Defendant's girlfriend, Sue Kennedy, testified that a woman named Jennifer called defendant at the apartment she shared with defendant. She testified further that sometime in February 1991 she noticed a cut on defendant's forehead that he said was the result of a garage door shutting on top of his head. After defendant was arrested, Kennedy had a phone conversation with defendant in which he told her he had gone to the Dean residence with Mark Redden, a friend of his, to "beat up" Dean's husband. He told Kennedy that, when Redden started attacking Curtis James Dean with a tire iron, defendant ran into the bathroom and stayed there. Kennedy asked defendant if he had killed Dean for insurance money. Defendant remained silent.

On May 6, 1991, defendant gave a statement regarding the murder of Curtis James Dean to an Army investigator, Lester Powlen. The interview was taped and the tape was played for the jury. Defendant described how Hunter approached him and asked him to find someone to kill Jennifer Dean's husband. Defendant met with Dean and told her he would arrange "the hit" for $10,000. She gave him a photograph of her husband. At a second meeting, she advanced him $500.

Defendant recruited Mark Redden to help with the murder. On the night of the murder, Redden and he went to the Taco Bell where Jennifer Dean worked and obtained the key to her house. They drove to the Dean home and entered. Defendant was armed with a double-edged dagger and Redden carried the tire iron from defendant's car. The plan was for Redden to hit Curtis James Dean with the tire iron while defendant stabbed him. But defendant told the investigator that, once inside the bedroom where the victim was sleeping, he got "cold feet," told Redden he did not want to kill the victim, and went into the other room. Defendant claimed that Redden struck Dean with the tire iron, and, at one point, even struck defendant on the head. After Redden hit him, defendant said he went into the bathroom. He claimed that Redden took defendant's dagger. Defendant heard Sabrina Dean "screaming" while her father was being murdered.

Defendant said he cleaned the cut on his head with a green towel. He and Redden then left the house. After the murder, defendant threw his dagger, some latex gloves and pictures of Dean into a dumpster. He and Redden buried the tire iron and their clothing in the desert. Later, defendant took a homicide detective into the desert and led him to a site where two sets of clothing and a tire iron were found buried. The condition of the clothing negatively affected the ability to obtain serological results or genetic markers. Both pairs of pants, however, displayed impact stains and heavily saturated areas that appeared to be bloodstains.

### B. *Defense Guilt Phase Evidence*

Sandra Kay Hoyt, who babysat for Sue Kennedy, defendant's girlfriend, and then dated defendant herself, testified that she had observed Kennedy, Hunter, Mark Redden and James Winstein "snorting meth" in Kennedy's apartment. Defendant was not present at that time.

Detective Griego testified that, when he initially spoke to Gail Lebouef about her shooting, he showed her two photo lineups, one of which contained defendant's photograph and a photograph of Jeffrey Hunter, among others. Lebouef picked out the photograph of her ex-husband, but was unable to identify any other photograph. Later, he sent newspaper articles to Lebouef that contained photographs of Hunter, Jennifer Dean and defendant. Griego also testified that when he first contacted James Winstein, Winstein initially said he spent the 1990 Christmas holidays with his mother in Las Vegas. Later, he admitted he had agreed to drive defendant to Louisiana for $1,000 where defendant told him he was going to do "some type of drug deal."

After Griego advised Winstein of his rights, Winstein said he did not want to go to jail and would cooperate. Winstein then told Griego that defendant had told him he had shot a woman but that she did not die. Eventually Winstein told Griego he had known all along that he and defendant were going to Louisiana to kill Hunter's wife. Initially, Winstein said that defendant had not said anything to him about Erin Tynan's death, but then said defendant told him Tynan was killed because she was getting too close to a drug investigation. Griego told Winstein he needed help on the gun that had been used to shoot Lebouef. He told Winstein, "give me the gun and I'll write a letter to the D.A. saying you're helpful." It was only at Winstein's immunity hearing that he talked about seeing the gun being disassembled and thrown away.

Defendant also called eight-year-old Sabrina Dean. Sabrina testified that two men hurt her father. She denied having told police that her mother hurt her father with a knife and wiped the knife with a green towel. She also denied showing police the drawer where her mother kept knives or telling police that her mother had blood on her or took a shower after she came home. However, Sergeant Larry Brown of the San Bernardino Sheriff's Department testified that Sabrina first stated that two men had done "something bad" to her father but also said her mother had hit her father in the back with a knife. According to Brown, Sabrina said that her mother took a knife from the kitchen drawer, stabbed her father in the back, rinsed the knife off in the kitchen sink, and then replaced it in the kitchen drawer. The police took her to the Dean residence. She led them to the knife drawer and pointed out the knife she said her mother had used.

Brown testified that Sabrina repeated her statement about her father having been stabbed by her mother. Sabrina also again said that her father had been attacked by two men. At a final interview a few days after the murder, Sabrina said that her mother had stabbed her father after the two men had attacked him, in contrast to her earlier statements in which she said her mother had stabbed her father before the two men attacked him.[4]

### C. *Prosecution Penalty Phase Evidence*

The prosecution did not present additional evidence at the penalty phase of the trial.

### D. *Defense Penalty Phase Evidence*

A number of defendant's friends and family members came from defendant's home state of Alabama to testify on his behalf. These witnesses testified

---

[4] As noted, the pathologist testified that some of Dean's knife wounds were postmortem.

that defendant was a follower, rather than a leader, who tried to please people and for whom acceptance was important. Two of defendant's uncles who had served in the military testified that this trait of being a follower may have led defendant to be manipulated by Sergeant Hunter. Other witnesses testified that defendant was influenced in his behavior by Sergeant Hunter.

Defendant's friends also testified that defendant was deeply affected by the murder of his best friend, Eric King, when defendant was 17 years old. Defendant was extremely shaken by having witnessed the murder and became reclusive, paranoid and depressed. Testimony was also introduced regarding defendant's difficult relationship with a woman who came to live with defendant's family after his father died, and with his first stepfather. Defendant's friends and family members also testified that defendant had not been a violent person when he was growing up and they expressed shock at the charges of which he had been convicted.

Edward Fischer, a clinical psychologist, testified extensively about defendant, providing a social history. Defendant was born in Anniston, Alabama, and was the youngest of three brothers. As a child he was the target of his brother's ridicule because he was thin and sickly. When defendant was five, his father suffered a stroke and, approximately two years later, died following a second stroke. Defendant's father was the central figure in his life because his mother was busy with college and his brothers were at school. Defendant felt responsible for his father's death. After his father's death, a "masculine woman" named Sue came to live with the family and attempted to fill the paternal role. She was disliked by defendant and his brothers, and his oldest brother ran away while she was living with them.

After Sue's departure, defendant's mother married a man named Virgil. Defendant was eight years old. Defendant's stepfather constantly criticized him. Virgil eventually left. After Virgil left, defendant's older brothers also left home and his mother pursued her doctorate and was involved in her teaching and her church activities, leaving defendant on his own. Defendant became involved in Dungeons and Dragons, a fantasy game, and in karate. He also befriended Eric King, who became his best friend. When defendant was 17, Eric King was shot to death, in defendant's presence, following a confrontation with some other boys. Following the shooting, someone shot defendant's dog, which led defendant to believe the boys who had killed King were after him as well. Dr. Fischer described defendant's reaction to Eric King's death—depression, guilt and paranoia—as indicative of posttraumatic stress disorder.

During his teenage years, defendant used marijuana, drank beer and experimented with LSD.

At some point in his late teenage years, defendant's mother remarried and moved in with her new husband, leaving defendant alone in the family house. Defendant lived with a friend named Bobby Watson. They were joined by the woman who became defendant's wife, Kim. After Kim's boyfriend committed suicide, she attempted an overdose and was hospitalized. She asked defendant to get her out of the hospital and moved in with him and Watson.

After defendant and Kim married, defendant joined the Army. The marriage disintegrated, and Kim became involved with another man. After they separated, defendant began to exhibit what Fischer characterized as symptoms of manic behavior that may have been the beginning of hypomania. According to Fischer, symptoms of a hypomanic period, as set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders—Third Edition, include decreased need for sleep, more energy, increased self-esteem, productivity and creative thinking, extreme gregariousness, hypersexuality, excessive involvement in pleasurable activities with no concern for negative consequences, restlessness, increased talkativeness and inappropriate laughing. Fischer testified that another aspect of hypomania is a desire to please people and to look for external direction from other people rather than seeking it from within. Defendant's mania was exacerbated by his drug use, which included the use of amyl nitrate, liquid codeine and amphetamines. He also used steroids, a drug that can make a person's actions unpredictable and aggressive.

Fischer administered a series of tests to defendant including the Wechsler Adult Intelligence Test, a Bender-Gestalt Test and the Minnesota Multiphasic Personality Inventory (MMPI). The latter test indicated defendant was psychotic with a likely diagnosis of "bipolar disorder or mania." According to Fischer, a person with this profile is usually single, would have a hard time controlling himself, and exercises poor judgment. Defendant tested in the 98 percentile for mania and the 95 percentile for schizophrenia. Fischer explained, "When you get to this elevation . . . you are talking about somebody who is generally psychotic or prepsychotic." Fischer concluded that defendant was a full-blown manic. According to Fischer, while people suffering from hypomania know the difference between right and wrong "they may be responding to unreal . . . data in the sense of hallucinations or delusions." According to Fischer, the willingness of a manic to accommodate his feelings and attitudes to those of others, arising from "the relative instability of the ego" is "how people who are mentally defective are used by other people in . . . a conspiracy. He makes his decisions, he is responsible for his decisions, but he is unduly influenced by others."

The defense also presented the testimony of Sergeant Jeffrey Hunter from his trial. Hunter testified that he had counseled defendant about defendant's

drug problem. He admitted to having introduced defendant to Jennifer Dean, but denied having discussed with defendant a plan to kill Curtis James Dean. He also essentially denied participation in the shooting of Gail Lebouef. He testified that, after the murder of Curtis James Dean, defendant told Hunter if defendant were picked up and questioned, Hunter and Jennifer Dean would be "taken out." He also told Hunter that Hunter was supposed to have been "in that room" in New Orleans instead of Gail Lebouef and said, "I won't make that mistake next time." Hunter testified that these statements frightened him. Hunter also testified that defendant admitted to him his participation in the murder of Curtis James Dean, but Hunter questioned whether defendant had taken part in the murder.

A videotape of a police interview of Jennifer Dean was also played for the jury. Dean said that she stabbed her husband to death with a kitchen knife she had taken from the knife drawer in the kitchen. She said she was naked when she killed her husband, and, after killing him, cleaned the knife and put it back in the drawer. She said she then took a shower and got dressed. She said she had killed her husband because he had hurt Sabrina. She claimed that the earlier inconsistent statements she had given to the police about who killed her husband were false. She said no one had helped her kill her husband. She explained that Sabrina's comment about the two men who had attacked her father referred to the paramedics.

## II. ARGUMENT

A. *Pretrial Issues; Joinder*

Defendant contends that the trial court abused its discretion when it granted the prosecution's motion to consolidate charges involving Erin Tynan (rape and murder with felony-murder special circumstances), with those involving Gail Lebouef (conspiracy to commit murder and solicitation of murder) and those involving Curtis James Dean (conspiracy to commit murder and murder with financial gain, lying-in-wait and multiple-murder special circumstances). He additionally argues that, even if the trial court did not abuse its discretion at the time it granted the motion, joinder actually resulted in gross unfairness amounting to a denial of due process. (*People v. Ramirez* (2006) 39 Cal.4th 398, 440 [46 Cal.Rptr.3d 677].)

In relevant part, section 954 provides "if two or more accusatory pleadings are filed" charging "two or more different offenses of the same class of crimes or offenses . . . the court may order them to be consolidated." (§ 954.) " 'Murder and rape are assaultive crimes against the person and, as

such, are "offenses of the same class of crimes" within the meaning of section 954 and were properly joinable. [Citations.]' " (*People v. Ramirez, supra,* 39 Cal.4th at p. 439, quoting *People v. Maury* (2003) 30 Cal.4th 342, 392 [133 Cal.Rptr.2d 561, 68 P.3d 1].) "Thus, defendant must show that a substantial danger of prejudice compelled severance. [Citation.] We ask whether the denial of severance was an abuse of discretion, given the record before the trial court. [Citation.] A pretrial ruling that was correct when made can be reversed on appeal only if joinder was so grossly unfair as to deny due process." (*People v. Stitely* (2005) 35 Cal.4th 514, 531 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

■ " 'Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

Because defendant emphasizes what he asserts is the absence of cross-admissible evidence between the Tynan charges and the Lebouef and Dean charges, it is necessary to point out that section 954.1 expressly provides that "where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning one offense or offenses *need not* be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." (Italics added.) Thus, "cross-admissibility is not the sine qua non of joint trials." (*Frank v. Superior Court* (1989) 48 Cal.3d 632, 641 [257 Cal.Rptr. 550, 770 P.2d 1119].) Therefore, while "prejudice is usually dispelled" if "evidence of one crime would be admissible in a separate trial of the other crime" (*People v. Stitely, supra,* 35 Cal.4th at pp. 531–532), "lack of cross-admissibility is not, by itself, sufficient to show prejudice and bar joinder. [Citations.]" (*Id.* at p. 532; see *Belton v. Superior Court* (1993) 19 Cal.App.4th 1279, 1286 [24 Cal.Rptr.2d 34] [§ 954.1 "is a codification of several Supreme Court cases . . . that hold that while cross-admissibility may be considered as a factor suggesting possible prejudice, the absence of cross-admissibility does not, by itself, suffice to demonstrate prejudice"].)

Setting aside for a moment the issue of cross-admissibility, none of the other factors for assessing prejudice arising from joinder support defendant's

claim that the trial court abused its discretion by granting consolidation. None of the three cases was more inflammatory than the other, as each involved comparably egregious facts. Nor was the evidence of one case significantly weaker than the evidence of the others so as to create the danger of a "spillover" effect that occurs when "weaker charges [are] joined with strong charges so that the effect of the aggregate evidence might alter the outcome of the trial." (*People v. Marshall* (1997) 15 Cal.4th 1, 28 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

With respect to the Tynan case, defendant's hairs were found in Tynan's hand and his semen in her vagina. He was aware that she was in possession of the Jennings handgun, which was the only item missing from her apartment after her murder, and he was observed with a handgun after the murder. Furthermore, defendant was aware of details of the murder before they were released to the public, and he told Winstein that he had killed Tynan. Regarding the Lebouef case, defendant's accomplice, Winstein, testified about defendant's commission of the offenses against Lebouef, and Lebouef identified defendant as the man who tried to kill her. As to the Dean case, defendant's own statement established that he had been hired to kill Curtis James Dean. He also admitted to having been at the scene of the Dean murder, although he tried to minimize his participation. He was also implicated in the Dean murder by blood evidence and Sabrina Dean's testimony that two men hurt her father. Thus, the evidence against defendant was equally strong in all three cases.

Finally, "[t]he capital charges were not the result of joinder of the various incidents." (*People v. Mendoza* (2000) 24 Cal.4th 130, 162 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

On the issue of cross-admissibility, defendant essentially concedes that the evidence in the Lebouef case was cross-admissible in the Dean case because both "arguably share some common characteristics" but claims that "the Tynan offense is totally dissimilar from both of them."

As we explained in *People v. Johnson* (1988) 47 Cal.3d 576 [253 Cal.Rptr. 710, 764 P.2d 1087], the issue of cross-admissibility "is not cross-admissibility of the charged offenses but rather the admissibility of relevant evidence" that tends to prove a disputed fact. (*Id.* at p. 589; see Evid. Code, § 210.) Thus, in *Johnson*, we concluded that cartridges and a gun clip found at the scene of a rape were arguably taken from the scene of an earlier murder and were "circumstantial evidence that defendant was involved in both crimes." (47 Cal.3d at p. 589.) Similarly, here, evidence that the Jennings .22-caliber handgun was taken from Tynan's apartment and then was arguably used in the attempted murder of Gail Lebouef is circumstantial evidence that defendant was involved in both crimes.

Defendant contends that his use of the handgun in the Lebouef case could have been established without admission of any evidence regarding how he obtained the gun, and that his removal of the handgun from Tynan's apartment could have been established without the evidence of his subsequent use of the handgun in the Lebouef case. But defendant was identified as the perpetrator of the attempt to kill Lebouef and, therefore, evidence that he used the gun taken from Tynan's apartment in the attempt on Lebouef would constitute some evidence that he was also the person who removed the gun from Tynan's apartment and, by implication, murdered Tynan. Thus, in a separate trial of the Tynan offenses, evidence of defendant's use of the gun in the attempt on Lebouef could be admissible on the question of identity. Similarly, in a separate trial of the Lebouef case, evidence that defendant was identified, through DNA evidence, as the person who assaulted Tynan and removed the gun from her apartment, the gun which was then used against Lebouef, could be admitted as some evidence that defendant was the person who attempted to kill Lebouef. Thus, in citing the potential cross-admissibility of the handgun evidence as one reason supporting consolidation of these cases we cannot say the trial court's exercise of discretion was " 'outside the bounds of reasons.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 408 [79 Cal.Rptr.2d 408, 966 P.2d 442]; see *People v. Johnson, supra*, 47 Cal.3d at p. 590 ["In weighing its discretionary power to order separate trials, the trial court could consider this interplay of evidence between the two occurrences"].)

We emphasize, however, that, even if cross-admissibility did not support consolidation of the cases, the absence of cross-admissibility alone would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion. (*People v. Stitely, supra*, 35 Cal.4th at pp. 531–532.)

■ We agree with defendant that the various theories offered by the prosecution that evidence in the Tynan case was cross-admissible in the Dean case are not persuasive. Contrary to the prosecution's claim, there was nothing so distinctive about the use of a knife in the two cases as to support an inference that defendant was the perpetrator. Nor does the additional fact that defendant's entry into each victim's residence was accomplished without force to support such an inference. (*People v. Bean* (1988) 46 Cal.3d 919, 937 [251 Cal.Rptr. 467, 760 P.2d 996] [to be admissible as modus operandi evidence the "common marks must be distinctive rather than ordinary aspects of any such category of crime. They must be sufficiently distinctive that they bear defendant's unique 'signature' "].) Nonetheless, the lack of cross-admissible evidence as between the Tynan and Dean offenses does not establish prejudice where, as explained, the offenses were of the same class and therefore statutorily joinable under section 954.1, and none of the factors

relevant to the assessment of prejudice supports defendant's claim of prejudice. Moreover, for the reasons explained above, because the handgun evidence was cross-admissible in the Tynan and Lebouef cases and evidence from the Lebouef case was, in turn, cross-admissible in the Dean case, consolidation of all three cases served the interest of judicial efficiency. (*People v. Ochoa, supra,* 19 Cal.4th at p. 409 ["Because consolidation ordinarily promotes efficiency, the law prefers it"].) Accordingly, we conclude that the trial court did not abuse its discretion when it granted the joinder motion.

We also reject defendant's further claim that, even if the trial court did not abuse its discretion in the first instance by granting joinder, its ruling actually resulted in gross unfairness amounting to a denial of due process. (*People v. Stitely, supra,* 35 Cal.4th at p. 531.) Defendant asserts that evidence of "planning, deliberative actions, and lack of regard for the well-being of others" introduced in connection with the Dean and Lebouef offenses influenced the jury's consideration of the Tynan offense, which he argues had none of this type of direct evidence. His premise that such evidence was lacking with respect to the Tynan offense is erroneous. The circumstances of the Tynan offense show planning, purpose and a disregard for her well-being. Defendant, who had expressed a sexual interest in Tynan and was aware she was in possession of the handgun he had sold to William Jones, Jr., gained admittance to her apartment, raped and murdered her, and took the handgun to use in the attempt on Lebouef's life. Therefore, we reject defendant's claim that there was a spillover effect of evidence admitted in connection with the Dean and Lebouef cases into the Tynan case, much less that such evidentiary spillover resulted in a due process violation.

Finally, as a corollary argument, defendant contends that the trial court erred by failing to sua sponte instruct the jury that it could not use evidence of one crime to convict him of other crimes. Defendant maintains that this instructional error violated his due process rights, right to unbiased jury and to a fair and reliable penalty determination.

As defendant concedes, pursuant to CALJIC No. 17.02, the jury was instructed as follows: "Each count charges a distinct crime. You must decide each count separately. The defendant may be found guilty or not guilty of any or all the crimes charged. Your finding as to each count must be stated in a separate verdict."

In *People v. Catlin* (2001) 26 Cal.4th 81 [109 Cal.Rptr.2d 31, 26 P.3d 357], we concluded that the trial court had correctly refused to give an instruction along the same lines as the instruction defendant argues should have been given here: " 'Evidence applicable to each offense charged must be considered as if it were the only accusation before the jury.' " (*Id.* at p. 153.) We

explained that "[c]ontrary to the import of the proposed special instruction, under Evidence Code section 1101 the jury properly could consider other-crimes evidence in connection with each count, and also could consider evidence relevant to one of the charged counts as it considered the other charged count." (*Ibid.*) We noted that in *Catlin*, as here, certain evidence would have been cross-admissible in separate trials of the offenses. Finally, we rejected the proposed instruction as cumulative of CALJIC No. 17.02. (26 Cal.4th at p. 153.)

As the Attorney General points out, in this case, unlike *Catlin*, defendant failed even to propose a modification of CALJIC No. 17.02, or to propose an additional instruction, thus forfeiting the claim of instructional error. (*People v. Kimble* (1988) 44 Cal.3d 480, 503 [244 Cal.Rptr. 148, 749 P.2d 803] [where trial court "correctly instructed the jury regarding that law, it was defendant's obligation to request any clarifying or amplifying instruction on that subject"].) Even if defendant had not forfeited the claim, we would reject it for the same reasons we rejected the comparable argument advanced in *Catlin*. Necessarily, then, we reject defendant's collateral claim that the instructional error lowered the prosecution's burden of proof.

### B. *Guilt Phase Issues*

#### 1. *Third Party Culpability Evidence*

Defendant contends that the trial court erred when it excluded evidence that a man named Kelvin Sloan, rather than defendant, may have murdered Erin Tynan. He asserts, further, that the error violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution. We find no error.

##### a. *Background*

At a hearing conducted pursuant to Evidence Code section 402, the defense presented the testimony of Kelvin Sloan, Ruby Green, and Nilia Harrison for purposes of establishing a third party culpability defense based on the theory that Sloan, rather than defendant, killed Erin Tynan.

Sloan testified that in November 1990, he was a Marine stationed at Fort Irwin and also worked part time at a restaurant called Naugles. There, on November 5 or 6, he met Tynan. A day or two after he met her, he spent several hours at her apartment, but he did not engage in sexual relations with her. He testified he went to her house on one other occasion, staying for about an hour, but he could not remember the date.

According to the evidence, Erin Tynan was murdered in Barstow on the night of November 14, 1990. Sloan testified that he was hospitalized at Camp Pendleton from November 9 to November 16, 1990, for a seizure disorder, after he collapsed at a ceremony marking the "Marine Corps birthday." Camp Pendleton is 160 to 170 miles away from Barstow. For the first two days of Sloan's hospitalization, he was strapped to a bed that had the guardrails up. The guardrails remained up until he was released from the hospital on November 16. He was not permitted to leave the hospital before that date. On November 16, Sloan was transported by ambulance from the hospital to Fort Irwin and from November 19 to November 23, he stayed with his sister at her home in Moreno Valley. Documents presented at the hearing supported Sloan's testimony that he was not discharged from the hospital at Camp Pendleton until November 16, two days after Tynan's murder. Defense counsel acknowledged that "The record does show a discharge date of the 16th . . . . That part is true."

Following Sloan's testimony and the introduction of the hospital discharge papers, the trial court told defense counsel, that "I am proceeding on the assumption based on the witness' testimony that it was impossible for him to leave the Camp Pendleton facility to be in Barstow on the date in question. You will have every opportunity to check with Marine personnel, Navy personnel, whatever, to rebut that assertion. But if you are unable to rebut it, I will have to accept as being true the fact that [Sloan] was confined in a locality which is a long ways from Barstow and that he therefore could not have been in the Barstow area at the time the crime was committed." Defense counsel agreed that the distance between Camp Pendleton and Barstow "is at least 160, 170 miles."

Nevertheless, to "perfect the record," the trial court allowed the defense to call Ruby Green and Nilia Harrison. Ruby Green testified that she and Sloan were living together in November 1990 and continued to live together until they separated in April 1991.[5] Green testified that she saw Sloan at Naugles with Tynan on the night Tynan was murdered. She knew it was that night because she read about the murder in the newspaper "a couple of days later." She testified further that Sloan did not come home that night and, when he did, he was wearing clothes other than the Naugles uniform in which she had seen him earlier. He told her he had gone to the barracks to pick up some clothes and had fallen asleep after he and someone named Boyd dropped Tynan off at her house. Green acknowledged that Sloan had spent three or four days in the hospital in November 1990. On cross-examination, she also acknowledged that she did not know the date of Tynan's murder or the date when Sloan did not come home.

---

[5] The precise nature of their relationship was not established, but Green had a baby by another man while she was living with Sloan.

Nilia Harrison testified that, toward the end of 1990, she was at the home of her cousin, Eva Lawrence, with Sloan. Sloan told her the police had picked him up in connection with Tynan's murder. Sloan told her he and Tynan had been close friends "and they were trying to set him up for the murder." She then testified that he told her "he didn't mean to do it." She said she told Sloan "that [Harrison's] friend . . . was talking about his friend was getting set up for the murder and that this friend was Jonathan Knox." Sloan asked her about a man named Ephraim Rollins "[b]ecause he said he wanted to know that person that looked like him Ephraim, [and] he wanted to know Jonathan Knox." Harrison then testified that Sloan said "that he didn't mean to kill her." On cross-examination and redirect examination she again testified that Sloan said someone had set him up for the murder and that the person who committed it "looked just like him." She again testified that Sloan told her he "didn't mean to kill her." She acknowledged that she did not remember when the conversation had occurred.

Following argument, the trial court ordered the defense not to mention Sloan or the other witnesses during opening argument, or in the questioning of any witness, or to call Green or Harrison "until we have had a further hearing outside the presence of the jury to establish the relevance of any of their testimony. But my preliminary ruling is that based on [the hospital discharge documents that] at least on their face . . . establish the fact that Mr. Sloan could not have been in Barstow on the date of the murder and therefore his testimony and the testimony of the other two witnesses would be irrelevant." The defense did not renew its attempt to present this evidence.

b. *Analysis*

■ "The principles of law are clear. . . . [T]he standard for admitting evidence of third party culpability [is] the same as for other exculpatory evidence: the evidence [has] to be relevant under Evidence Code section 350, and its probative value [can]not be 'substantially outweighed by the risk of undue delay, prejudice, or confusion' under Evidence Code section 352." (*People v. Kaurish* (1990) 52 Cal.3d 648, 685 [276 Cal.Rptr. 788, 802 P.2d 278].) "At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99]; see *People v. Panah* (2005) 35 Cal.4th 395, 481 [25 Cal.Rptr.3d 672, 107 P.3d 790].)

Applying this standard, it is clear that Ruby Green's testimony—that she saw Sloan with the victim the night of the murder, that he failed to return to their residence that night, and later told her that he and Boyd had dropped Tynan off at her apartment—was properly excluded. Such evidence does not rise even to the status of motive evidence. While it could be generously construed as possible evidence that Sloan had the opportunity to commit the crimes, as noted, evidence of mere opportunity without further evidence linking the third party to the actual perpetration of the offense is inadmissible as third party culpability evidence.

Somewhat more problematic is the testimony of Nilia Harrison that Sloan made comments that could be construed as an admission that he killed Erin Tynan. The problem here is not, as defendant maintains, that the trial court improperly excluded the testimony because defendant failed to produce evidence controverting the documentary evidence that Sloan was in a hospital 160 or 170 miles away from Barstow the night Tynan was killed. The problem is that admission of the evidence would have necessitated a minitrial on the question of Sloan's whereabouts on the night of the murder thus creating the possibility "of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Although the trial court did not expressly base its ruling on Evidence Code section 352, we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm. " ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason. If right upon any theory of law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704].) In light of the confused and contradictory tenor of Harrison's testimony—asserting at one point that Sloan said someone was framing him for the murder, and at another, that he confessed to it—her testimony possessed, as the prosecutor noted, "minimal probative value." Balanced against this minimal probative value was the "probability" that the admission of Harrison's testimony would have "necessitate[d] undue consumption of time or . . . confus[ed] the issues, or misle[d] the jury." (Evid. Code, § 352.) On this ground, therefore, the exclusion of her testimony was not error.

Even if we assume that the trial court erred by not admitting the testimony of Green or Harrison, any error was harmless. Other than the minimally probative testimony of these witnesses, there was no evidence at all, direct or circumstantial, that connected Sloan to the actual perpetration of the rape and

murder of Erin Tynan. By contrast, the evidence that defendant was the perpetrator was extremely strong. His sperm was found in the victim's vagina, his hairs were found in her hands, he revealed details of the murder to Rhonda Contreras that had not yet been made public, he used a firearm in the attempted murder of Gail Lebouef that was similar to the firearm taken from Tynan's apartment the night she was killed, and he told Winstein that he had killed Tynan. Therefore, "we conclude it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error." (*People v. Hall, supra,* 41 Cal.3d at p. 836, citing *People v. Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].)

### 2. *Exclusion of Jennifer Dean's Statement*

Defendant contends that the trial court erroneously excluded as hearsay a videotaped statement by Jennifer Dean in which she claimed to have killed her husband. Defendant sought to introduce the videotape under the hearsay exception for statements against penal interest. (Evid. Code, § 1230.) He asserts that the error violated his Fifth, Sixth and Fourteenth Amendment rights to a fair trial. We conclude that the trial court properly excluded the statement as untrustworthy. (*People v. Cudjo* (1993) 6 Cal.4th 585, 607 [25 Cal.Rptr.2d 390, 863 P.2d 635] [trustworthiness is a threshold requirement for admission of a statement under Evid. Code, § 1230].)

#### a. *Background*

After her husband's murder, Jennifer Dean was questioned by police and gave three statements, two of which were videotaped. In her first statement, which was videotaped, she said she came home from work, was unable to find her husband, and knew nothing of his death. In a second statement, which was not videotaped, she suggested that defendant and Jeffrey Hunter had killed her husband on their own initiative to obtain insurance money. In a third statement, which was videotaped, she told police that she alone had killed her husband because he had hurt their daughter, Sabrina. She claimed to have stabbed him to death with a kitchen knife while she was nude, following an argument with him. After killing her husband, she said she washed the knife, took a shower, dressed, and called her neighbors.

Defendant called Dean to the stand, but she asserted her privilege against self-incrimination and was declared by the trial court to be unavailable.[6]

---

[6] At the time of defendant's trial, Dean had been tried and acquitted of the murder of her husband, but faced possible retrial on the charge of conspiracy to commit murder, a mistrial having been declared on this count after her jury failed to reach a verdict.

Defendant then sought to introduce the third statement as a statement against penal interest. (Evid. Code, § 1230.) Ultimately, the trial court declined to admit the third statement on the grounds that it failed to meet the exception's threshold requirement of trustworthiness. The court observed that the first and third statements were "virtually mutually contradictory which indicated that . . . at least one of the versions was unreliable because it was contradicted by another version." The court found, further, that taken as a whole the third statement was "exculpatory, whether it was setting up a possible defense of self-defense or reduction of a charge from murder to manslaughter or whatever." Alternatively, the trial court found that the statement was barred by Evidence Code section 352 because "to rule to the contrary would open up this whole trial to other evidence which I think in the final analysis would confuse the jury."

### b. *Analysis*

"Evidence Code section 1230 provides that the out-of-court declaration of an unavailable witness may be admitted for its truth if the statement, when made, was against the declarant's penal interest. The proponent of such evidence must show 'that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 462 [48 Cal.Rptr.2d 525, 907 P.2d 373].) "The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." (*People v. Frierson* (1991) 53 Cal.3d 730, 745 [280 Cal.Rptr. 440, 808 P.2d 1197].) "[E]ven when a hearsay statement runs generally against the declarant's penal interest and redaction has excised exculpatory portions, the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission. . . . [¶] . . .We have recognized that, in this context, assessing trustworthiness ' "requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." ' " (*People v. Duarte* (2000) 24 Cal.4th 603, 614 [101 Cal.Rptr.2d 701, 12 P.3d 1110].) Finally, such statements, even if admissible are nonetheless subject to Evidence Code section 352 under which "the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption." (*People v. Cudjo, supra*, 6 Cal.4th at p. 609.)

A trial court's decision to admit or exclude evidence is a matter committed to its discretion " 'and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Brown* (2003) 31 Cal.4th 518, 534 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) The trial court did not abuse its discretion in excluding the videotape of the third statement. As the court observed, the third statement was utterly inconsistent with Dean's initial statement, in which she told police she knew nothing of her husband's death, and also inconsistent with her subsequent statement blaming defendant and Hunter for her husband's murder. Thus, on their face, two of her three statements were absolutely untruthful, rendering the reliability of any of the statements questionable. The fact that Dean confessed to killing her husband in the third statement did not, by itself, establish that the third statement was any more reliable than the other two. Dean's admission was accompanied by an explanation that she killed her husband because she had just quarreled with him and that he had hurt their daughter. Dean may have believed that this explanation minimized her culpability or excused her conduct altogether. Moreover, Dean was having an affair with Hunter and her third statement, taking the blame for the murder with an excuse, may have been her attempt to protect him and, by extension, his confederate, defendant. Thus, we conclude that in examining Dean's statement in light of "the circumstances under which [it was] uttered, [Dean's] possible motivation . . . and [Dean's] relationship to [Hunter]" (*People v. Frierson, supra*, 53 Cal.3d at p. 745), the trial court did not abuse its discretion in excluding the statement.

We also agree with the trial court's alternative justification for excluding the evidence under Evidence Code section 352. Given Dean's contradictory statements and the complexity of her possible motives for making them, had the third statement been admitted, the trial would have devolved into an inquiry into those matters. Thus, the questionable value of that evidence would have been "substantially outweighed" by the probability that its admission would have "necessitate[d] undue consumption of time" or "confuse[d] the issues" and misled the jury. (Evid. Code, § 352.) Having found no error, it is unnecessary to examine defendant's claims of constitutional error or prejudice.

### 3. *Admission of the Jones and Brunson Statements*

Defendant contends that the trial committed reversible error when it admitted statements by prosecution witnesses, William Jones, Jr., and Anthony Brunson, that defendant argues were inadmissible hearsay. Jones was permitted to testify that Erin Tynan indicated that she preferred muscular African-American men as sexual partners. The trial court admitted the testimony over defendant's objection as relevant to Tynan's "state of mind."

Brunson, in testifying to his efforts to purchase the Jennings .22-caliber handgun from Tynan, testified that in the fall of 1990, Tynan told him she had the gun. The trial court admitted the testimony over defendant's hearsay objection as nonhearsay evidence of Brunson's conduct, i.e., that he continued to seek to purchase the gun from her, relevant to whether she still possessed the gun the night she was murdered. Defendant argues that the errors were both individually and cumulatively prejudicial.

The trial court's evidentiary rulings are reviewed for abuse of discretion. (*People v. Jablonski* (2006) 37 Cal.4th 774, 821 [38 Cal.Rptr.3d 98, 126 P.3d 938]; *People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897] [admissibility of evidence turning on "hearsay rule/state of mind exception" subject to abuse of discretion review].) We conclude that the trial court did not abuse its discretion in admitting Jones's testimony and while it erred in admitting Brunson's testimony, the error was harmless.

Turning first to Jones's testimony regarding Tynan's indication of her preferences in men, the question is whether that testimony was admissible under the state of mind exception to the hearsay rule set forth in Evidence Code section 1250. In pertinent part, that section permits "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).)

In this case, because there was evidence that defendant had sexual relations with Erin Tynan the night she was killed, the Attorney General argues that the testimony was relevant to the issue of consent; i.e., that, given her preferences, Tynan would not have consented to sexual relations with defendant, who is White. We agree.

■ As we observed in *People v. Hernandez* (2003) 30 Cal.4th 835 [134 Cal.Rptr.2d 602, 69 P.3d 446], "[a] prerequisite to this exception to the hearsay rule is that the declarant's mental state or conduct be factually relevant." (*Id.* at p. 872.) *Hernandez* involved a murder victim's statement a week before he was killed that defendant and two others were going to kill him. As we pointed out, "A murder victim's fear of the alleged killer may be in issue when the victim's state of mind is directly relevant to an element of the offense." (*Ibid.*)

An example of this principle is found in *People v. Thompson* (1988) 45 Cal.3d 86 [246 Cal.Rptr. 245, 753 P.2d 37], in which we held that evidence

that the murder victim was afraid the defendant would kill her was admissible under the state of mind exception because it went to whether "she willingly had intercourse with defendant, which was very much in issue given the prosecution theory of murder during the commission of rape. As her expression of fear of defendant on the very night of the murder tends to indicate she did not consent to intercourse, it was relevant in this case." (*Id.* at p. 103, fn. omitted; see *People v. Waidla* (2000) 22 Cal.4th 690, 723 [94 Cal.Rptr.2d 396, 996 P.2d 46] [the decedent's statement that she feared defendant was relevant to whether the decedent would have consented to the defendant's entry into her residence where burglary and robbery special circumstances were alleged].)

██ Here, as in *Thompson*, the issue of consent was raised by the charge of forcible rape and the special circumstance allegation that the victim was murdered during the commission of a rape, was put into dispute by defendant's plea of not guilty and remained in dispute until resolved. (*People v. Waidla, supra*, 22 Cal.4th at p. 723.) Jones's testimony that Tynan had indicated to him she liked muscular African-American men bore some relevance to whether she would have consented to sexual relations with defendant. Contrary to defendant's assertion, that evidence need not have been dispositive on the issue of consent to have been admissible on that point. (Evid. Code, § 210 [relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].) Defendant's further claim that the evidence was inadmissible to prove the truth of the statement—that Tynan preferred muscular African-American men—is unpersuasive. "The evidence admitted under section 1250 is hearsay; it describes a mental or physical condition, intent, plan, or motive *and is received for the truth of the matter stated.*" (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 [44 Cal.Rptr.2d 914], italics added.) Accordingly, we conclude that the trial court did not abuse its discretion in admitting Jones's testimony.

Even were we to conclude the trial court abused its discretion, we would find the error harmless. Jones's testimony was cumulative to the testimony of Robert Bishop, who had been in a relationship with Erin Tynan. Bishop not only testified, without objection, that Tynan preferred "muscular Black men," he also acknowledged that he fit this category. Thus, even had Jones's testimony been excluded, the evidence concerning Tynan's preferences was already before the jury. Moreover, in view of the overwhelming evidence that defendant raped and murdered Erin Tynan, admission of this fleeting reference to her predilections in men could have made no difference to the verdict.

Rather thornier is resolution of defendant's claim that the trial court abused its discretion when, over the defendant's objection, it admitted Anthony Brunson's testimony regarding his attempts to purchase the Jennings .22-caliber handgun left in Tynan's possession by Robert Bishop. In the course of his testimony, Brunson testified that Tynan told him she still had the gun.

■ To the extent Brunson's testimony related to his own attempts to purchase the gun, that testimony was not hearsay. (Cf. *People v. Alvarez* (1996) 14 Cal.4th 155, 185 [58 Cal.Rptr.2d 385, 926 P.2d 365] ["Hearsay, of course, is evidence of an out-of-court statement offered by its proponent to prove what it states"]; Evid. Code, § 1200.) However, his testimony as to what Tynan told him was hearsay and does not appear to have been admissible under any exception to the hearsay rule. Thus, his testimony of her statements that she still possessed the gun should have been excluded.

The trial court's failure to exclude the statements, however, is harmless. There was substantial evidence that Tynan was in possession of the gun the night she was killed, including testimony by Jones who left the gun with her in August, that, in October, she told him she wanted to sell it and had a buyer; the testimony of Robert Bishop that he saw a .22- or. 25-caliber semiautomatic in the closet of her bedroom in the fall of 1990, and Detective Griego's testimony that, in the search of her apartment following her murder, he found a .22-caliber cartridge on the top shelf of her bedroom closet, but no gun. There was also, of course, the evidence that defendant was observed shortly after the murder in possession of a similar gun and the testimony of William Blondet, the firearms examiner, that there was a good likelihood the bullet fired at Gail Lebouef was from a Jennings .22-caliber handgun. In view of this evidence, admission of Tynan's hearsay statements to Brunson was not prejudicial.

Finally, our conclusion that the admission of the testimony of Jones and Brunson was either not error or, if error, not prejudicial, necessarily disposes of defendant's claim of cumulative prejudice.

### 4. *CALJIC No. 2.03*

In connection with the Dean murder, the jury was instructed, over defendant's objection, with CALJIC No. 2.03, as follows: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning any crime for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

▮▮ Defendant contends that the instruction was impermissibly "partisan and argumentative" and also authorized the jury to draw "irrational permissive inferences" about defendant's guilt. As the Attorney General observes, we have consistently rejected such challenges to the instruction. (*People v. Benavides* (2005) 35 Cal.4th 69, 100 [24 Cal.Rptr.3d 507, 105 P.3d 1099] ["The instruction does not improperly permit the jury to draw irrational inferences, nor is it impermissibly argumentative"]; *People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Holloway* (2004) 33 Cal.4th 96, 142 [14 Cal.Rptr.3d 212, 91 P.3d 164] ["The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction"].) Defendant's arguments provide no persuasive reason to reconsider the soundness of these conclusions, and we decline to do so.

### 5. *CALJIC No. 2.71.5*

In connection with the Dean murder, the jury was instructed with CALJIC No. 2.71.5, regarding adoptive admissions.[7] The instruction reflects the adoptive admission exception to the hearsay rule, under which: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) In this case, the prosecution sought the instruction based on testimony by defendant's former girlfriend, Sue Kennedy, that, in a telephone call she had with defendant after his arrest, she asked him whether he had killed Curtis James Dean for insurance proceeds and he remained silent. Defendant contends that the instruction was improper because the prosecution failed to prove that defendant heard Kennedy's question or, if he did, that his silence could be construed as an adoptive admission.

---

[7] The instruction was as follows: "If you should find from the evidence that there was an occasion when the defendant, 1) under conditions which reasonably afforded him an opportunity to reply, 2) failed to make a denial or made false, evasive or contradictory statements, in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which such defendant now is on trial or tending to connect him with its commission, and 3) that he heard the accusation and understood its nature, then the circumstance of his silence and conduct on that occasion may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and conduct of the accused in the face of it. Unless you find that the defendant's silence and conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement." (Brackets omitted.)

Preliminarily, there is a question of whether defendant has forfeited this argument by failing to object to the instruction on the grounds he asserts on appeal. As the Attorney General points out, defendant made no objection to the admission of Kennedy's testimony. Defendant responds that he did object to the instruction and argues that this objection was sufficient to have preserved the issue on appeal. Even if the objection to the instruction generally preserved the issue, nowhere in defendant's objection did he make one of the specific arguments he advances here—that the prosecution failed to demonstrate that defendant heard Kennedy's question. Thus, this argument is forfeited.[8]

The specific basis of defense counsel's objection was that defendant's silence in the face of Kennedy's question "is not the usual circumstance in which I always thought of adoptive admission. Usually thought of in something of a more interrogative setting . . . ." Generously construing this statement to be, as defendant contends, an objection that his silence in the face of Kennedy's question did not constitute an adoptive admission, we conclude the claim is without merit.

 "For the adoptive admission to apply . . . a direct accusation in so many words is not essential." (*People v. Fauber* (1992) 2 Cal.4th 792, 852 [9 Cal.Rptr.2d 24, 831 P.2d 249].) "To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1011 [254 Cal.Rptr. 586, 766 P.2d 1].)

Kennedy, defendant's one-time girlfriend, and defendant were discussing the circumstances of Curtis James Dean's death. In the course of this conversation defendant admitted that he and Mark Redden had gone to the Dean residence to beat Dean, although he blamed Redden. Kennedy then asked defendant whether he had killed Dean for the insurance. Defendant remained silent. Embedded in Kennedy's statement was an implied accusation that defendant had killed Dean. The jury could have found that defendant's failure to respond to the accusation, particularly since he had just told Kennedy that Redden had killed Dean, was tantamount to an admission. Defendant's claim that the question was so complex that defendant's silence

---

[8] Even if he had not forfeited this part of his claim, it is meritless. The record demonstrates that Kennedy and defendant were engaged in a conversation, albeit by telephone, in which defendant fully participated by responding to Kennedy's other questions and admitting, for example, that he and Mark Redden had gone to the Dean residence and that Redden had beaten Dean. The jury could reasonably have inferred from this exchange that defendant heard the question.

should be construed as bafflement is not convincing. In any event, that question was one for the jury to decide. We conclude that the evidence supported the instruction and the instruction was properly given.

### 6. *Felony-murder Instruction*

Defendant contends that instructions permitting him to be convicted of first degree murder on a felony-murder theory violated his rights under the Eighth and Fourteenth Amendments because he was charged only with second degree "malice murder" under section 187 and not with first degree felony murder under section 189. Defendant contends the trial court lacked jurisdiction to try him for first degree murder. He also appears to claim a lack of notice that he could be convicted on a felony-murder theory. Defendant's argument rests on the premise that under *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], felony murder and premeditated murder are separate crimes, and that *Dillon* implicitly overruled *People v. Witt* (1915) 170 Cal. 104 [148 P. 928], in which we held that a defendant may be convicted of felony murder even though the information charged only murder with malice. As he concedes, we have rejected this claim.

" '[W]e have long held that a pleading charging murder adequately notifies a defendant of the possibility of conviction of first degree murder on a felony-murder theory.' [Citation.] Defendant mistakenly relies on *People v. Dillon*[, *supra*,] 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], and in particular on a statement in the plurality opinion that the . . . felony murder and murder with express or implied malice, 'are not the "same" crimes.' [Citation.] As we have since explained, however, this means only that the elements of the two kinds of murder differ; there is but a single statutory offense of murder. [Citations.] 'Felony murder and premeditated murder are not distinct crimes . . . .' [Citation.]" (*People v. Silva* (2001) 25 Cal.4th 345, 367 [106 Cal.Rptr.2d 93, 21 P.3d 769].) In this connection, "numerous appellate court decisions have rejected defendant's jurisdictional argument. [Citations.] . . . [S]ubsequent to *Dillon, supra*, 34 Cal.3d 441, we have reaffirmed the rule of *People v. Witt, supra*, 170 Cal. 104, that an accusatory pleading charging a defendant with murder need not specify the theory of murder upon which the prosecution intends to rely. Thus we have implicitly rejected the argument that felony murder and murder with malice are separate crimes that must be pleaded separately." (*People v. Hughes* (2002) 27 Cal.4th 287, 369 [116 Cal.Rptr.2d 401, 39 P.3d 432].)

It is true that "we have acknowledged that in some instances an information charging murder without elaboration may not provide notice sufficient to

afford the due process of law guaranteed by the Fourteenth Amendment to the federal Constitution." (*People v. Silva, supra*, 25 Cal.4th at p. 368.) Here, however, defendant was amply aware that the prosecution was proceeding on a felony-murder theory. In connection with the Tynan murder, the information charged defendant with rape as well as alleging rape-murder special circumstances, and the prosecution introduced evidence supporting each crime charged and each special circumstance alleged.[9] "In any event, because defendant did not move to reopen when he learned that the court would instruct the jury on felony murder, his claim of insufficient notice is not preserved for appellate review." (25 Cal.4th at p. 368.)

### 7. *Failure to Give Unanimity Instruction*

■ As to the Tynan murder, the jury was instructed on first degree premeditated murder and first degree felony murder. Defendant contends that the trial court erred by failing to instruct the jury that it had to unanimously agree on which type of murder defendant had committed before convicting him of first degree murder. As defendant concedes, we have previously rejected this argument. (E.g., *People v. Benavides, supra*, 35 Cal.4th at p. 101 ["When, as here, the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed, the jury need not unanimously agree on the theory under which the defendant is guilty. [Citation.] This rule of state law passes federal constitutional muster"].) "We are not persuaded otherwise by *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]. There, the United States Supreme Court found a constitutional requirement that any *fact* that increases the maximum penalty for a crime, other than a prior conviction, must be formally charged, submitted to the fact finder, treated as a criminal element, and provided beyond a reasonable doubt. [Citation.] We see nothing in *Apprendi* that would require a unanimous jury verdict as to the particular *theory* justifying a finding of first degree murder. (See also *Ring v. Arizona* (2002) 536 U.S. 584, 610 [122 S.Ct. 2428, 2443–2444, 153 L. Ed. 566] [requiring jury finding beyond reasonable doubt as to *facts* essential to punishment]." (*People v. Nakahara, supra*, 30 Cal.4th at pp. 712–713.) Defendant's criticisms of our prior decisions do not persuade us and we see no need to reexamine them.

---

[9] Defendant's argument appears to be directed primarily at his conviction of the Tynan murder, though he also seems to be contending that he had insufficient notice that the Dean murder would be tried as first degree murder based on the "malice murder" allegations in the information. As to the Dean murder, however, the information alleged financial gain, lying-in-wait, and multiple-murder special circumstances (§ 190.2, subd. (a)(1), (3), (15)), and evidence was adduced in support of each of those special circumstances, all of which were found to be true. Therefore, his notice argument is no more persuasive in this context than with respect to the Tynan murder.

### 8. *Sufficiency of Definition of Rape in CALJIC No. 10.00*

With respect to the allegation that defendant forcibly raped Erin Tynan, the jury was instructed with CALJIC No. 10.00, which defines rape as "an act of sexual intercourse with a female person who is not the spouse of the perpetrator accomplished against such person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury to such person." Defendant contends that the absence of a further definition of "sexual intercourse" as vaginal penetration, as opposed to anal penetration, renders the instruction constitutionally deficient.

 We have previously rejected the argument that " 'sexual intercourse' is a technical term with various meanings and might be misunderstood when used in a definition of rape." (*People v. Holt* (1997) 15 Cal.4th 619, 676 [63 Cal.Rptr.2d 782, 937 P.2d 213].) "[W]e have held that 'sexual intercourse' has a common meaning in the context of rape, that no technical elaboration is required, and that the term can only refer to vaginal penetration or intercourse." (*People v. Stitely, supra,* 35 Cal.4th at p. 554.) Defendant attempts to distinguish *Holt* and *Stitely* on the grounds that, in those cases, the jury was also instructed with the definition of sodomy. (*People v. Stitely, supra,* 35 Cal.4th at p. 554 ["Also, no risk of confusion exists where the court properly gives other instructions defining sodomy as anal penetration"]; *People v. Holt, supra,* 15 Cal.4th at p. 676.) Our conclusion that "sexual intercourse" as used in CALJIC No. 10.00 has the common meaning of vaginal penetration does not, however, depend on the fortuity of whether the defendant also committed sodomy. In this case, moreover, as both counsel acknowledged in closing arguments, the evidence relevant to defendant's sexual assault on Erin Tynan—defendant's semen in her vagina—involved vaginal penetration; they differed only as to whether the absence of injury to vaginal area supported the rape allegation.[10]

### 9. *DNA Evidence*

Dr. Robin Cotton, the prosecution's DNA expert, testified that in her opinion DNA extracted from vaginal swabs taken from Erin Tynan matched a sample of defendant's DNA. She also provided two calculations regarding the frequency of the matched DNA profile in the general population and in the Caucasian population; for the former, the frequency was one in 53,000 and for the latter, one in 5.7 million. Defendant contends that admission of Dr. Cotton's testimony violated his constitutional rights on two distinct grounds. First, he asserts that her testimony violated his Sixth Amendment

---

[10] Although the prosecution's pathologist referred briefly to anal abrasion, defendant was not charged with sodomy, nor did either side refer to this evidence during closing argument.

confrontation right as construed by the Supreme Court in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], because her opinion regarding the match between defendant's DNA and DNA extracted from the vaginal swabs was based on testing that she did not personally conduct. Second, citing *People v. Wilson* (2006) 38 Cal.4th 1237 [45 Cal.Rptr.3d 73, 136 P.3d 864], defendant argues that Dr. Cotton's use of a population frequency calculation for Caucasians alone violated his due process rights by improperly suggesting to the jury that the perpetrator of the Tynan rape and murder was a member of defendant's racial group. We reject both arguments.

### a. *Background*

Dr. Cotton is the laboratory director for Cellmark, a private, for-profit company that performs DNA testing in paternity and criminal cases. Cellmark accepts criminal cases from both the prosecution and defense; its analysts conduct the testing and provide the results to those who requested them. Cellmark was accredited by the American Society of Crime Laboratory Directors after an inspection and review process that included examination of Cellmark's quality assurance procedures.

Dr. Cotton has a B.S. and M.S. in biology and a Ph.D. in molecular biology and biochemistry. DNA had been her field of research for the 15 years preceding her testimony. As Cellmark's laboratory director, Dr. Cotton oversees testing and supervises the six analysts who conduct the testing. Additionally, at the time of defendant's trial, she had testified as a DNA expert about 20 times in California as well as in other jurisdictions.

Dr. Cotton's testimony covered several areas. She testified about the characteristics of DNA and how, by extraction and testing of DNA, it is possible to generate a genetic profile for each individual and match a known sample to a sample the source of which is unknown. She explained in detail the procedure by which DNA is extracted and the samples prepared for comparison, using a process called restriction fragment length polymorphism (RFLP).[11] Dr. Cotton testified that DNA extraction is not a difficult procedure and the process by which the samples are prepared at Cellmark follows a

---

[11] Because defendant does not challenge the validity of RFLP analysis, it is unnecessary to discuss it in any detail. Dr. Cotton's testimony was largely consistent with the description of that process set forth in *People v. Venegas* (1998) 18 Cal.4th 47 [74 Cal.Rptr.2d 262, 954 P.2d 525]. We explained: " 'There are three discrete steps in [RFLP] analysis . . . : (1) *processing* of DNA from the suspect and the crime scene to produce X-ray films [autorads] which indicate the lengths of the polymorphic fragments; (2) examination of the [autorads] to determine whether any sets of fragments *match*; and (3) if there is a match, determination of the match's *statistical significance.*' " (*Id.* at p. 60, quoting *People v. Barney* (1992) 8 Cal.App.4th 798, 806 [10 Cal.Rptr.2d 731].) As we further explained the first step of RFLP analysis—processing

protocol that lays out the order of each step in the analysis. Cellmark's analysts may not deviate from the protocol without permission. According to Dr. Cotton, the protocol is like a recipe—"You know, first you do this and then you do this and then you heat it at 37 degrees for a half hour and then you do this other thing"—and, at each point in the procedure, the analyst is required to fill out a form and also required to keep handwritten notes recording his or her activity. This record is sufficiently complete that Dr. Cotton or another analyst could reconstruct what the analyst who processed the samples did at every step.

Dr. Cotton also testified about the significance of a match in terms of the frequency of a particular DNA profile in a given population. She explained: "If two profiles are the same, then it means the known person can't be excluded as having donated the sample from which the DNA profile in the evidence was obtained . . . . [¶] . . . Since each of the bands in the profile is a genetic trait, you can say, well, how often would another person have this same combination in the same way . . . . [¶] But rather than just saying it's generally very small or the patterns are rare, you can do a population survey . . . . [¶] . . . So doing a survey and then comparing the DNA profile that matches—of a known [sample] that matches an evidence [sample], you can ask the question how often would I expect to see this particular DNA profile in a Caucasian population or an African-American population or a[n] Hispanic population? And by that exercise give information to others about whether this particular grouping of genetic traits is a common event or a rare event."

Dr. Cotton testified that, for purposes of determining the frequency of a particular DNA profile in a given population, Cellmark had developed DNA databases for three major racial and ethnic groups—Caucasian, African-American and Hispanic—using blood samples obtained through various sources. Cellmark ordinarily calculates the frequency of a genetic profile for each of the three groups. Dr. Cotton testified that there is an alternative calculation called the "interim ceiling method." According to Dr. Cotton, the interim ceiling method does not calculate frequencies by ethnic or racial groups but "just survey[s] each group, and whatever frequency is the largest, use[s] that one in the calculation. So instead of having three calculations, you are only going to have one and you are going to pick the figure that you use

---

DNA samples and generating autorads—involves seven distinct substeps: "extraction, restriction, electrophoresis, denaturing, 'Southern transfer,' hybridization, and autoradiography." (*People v. Venegas, supra,* at p. 60.) Again, citing *Barney,* we provided descriptions of these substeps (*id.* at pp. 60–62), which the reader may consult. What is important for purposes of defendant's present claim is that Paula Yates, a biologist with Cellmark, rather than Dr. Cotton, performed the laboratory work required for completing the first step.

by looking across all three racial groups . . . and picking the figure that's the largest."

Finally, Dr. Cotton testified about the results of DNA testing obtained from comparisons of DNA samples provided by defendant and other individuals who had known Erin Tynan, and DNA samples extracted from a bedsheet and vaginal swabs taken from the victim's bed and from the victim herself. Dr. Cotton testified that the analysis of the samples was performed by Paula Yates, one of Cellmark's biologists. Dr. Cotton reviewed the forms Yates filled out at various points in the RFLP protocol and her handwritten notes, as well as all the other data in the case, including the autorad. (See *ante*, fn. 11.) She and Yates cosigned the DNA report in this case, as well as two followup letters to the San Bernardino Sheriff's Department.

Dr. Cotton testified that the evidence samples, including a blood sample from defendant and the vaginal swabs, were received intact by Cellmark. She testified further that, based on her review of Yates's notes, in her opinion the DNA extraction was conducted according to protocol. Viewing the genetic profiles generated by Yates, she testified that, in her opinion, DNA extracted from the bedsheet matched a DNA sample provided by Eugene Knox. Further, DNA extracted from the vaginal swabs matched DNA samples from Erin Tynan and from defendant. Using the product rule, she testified that the frequency of the DNA profile match between Eugene Knox's DNA and DNA obtained from the bedsheet in the African-American population was one in 700,000. With respect to the DNA profile match between defendant's DNA and the DNA from the vaginal swabs, she provided frequency calculations using both the interim ceiling method and the product rule; under the former, the frequency of the profile in the general population was one in 53,000, under the latter, the frequency of the profile among Caucasians was one in 5.7 million.

b. Crawford *claim*

At trial, defendant objected to Dr. Cotton's testimony about the DNA analysis that resulted in the match between defendant's DNA and DNA extracted from the vaginal swabs on the grounds that Cotton "didn't actually run the tests herself." He argued that the test results were inadmissible unless Paula Yates testified. The trial court stated that the results were a business record but also said that, even if Yates's analysis was "hearsay," Dr. Cotton could nonetheless rely on it for purposes of formulating her opinion as a DNA expert. On appeal, citing *Crawford v. Washington, supra,* 541 U.S. 36 (*Crawford*), defendant renews his claim that Dr. Cotton's testimony violated his Sixth Amendment right of confrontation.

Prior to *Crawford, supra*, 541 U.S. 36, "the Supreme Court had held that an unavailable witness's out-of-court statement against a criminal defendant could be admitted consistent with the [Sixth Amendment's] confrontation clause if it bore 'adequate "indicia of reliability." ' [Citation.] To qualify under that test, evidence had either to fall within a 'firmly rooted hearsay exception' or bear 'particularized guarantees of trustworthiness.' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 711, fn. 25 [27 Cal.Rptr.3d 360, 110 P.3d 289], quoting *Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 100 S.Ct. 2531].) *Crawford* abandoned this approach to such statements, however, and held that testimonial out-of-court statements offered against a criminal defendant are rendered inadmissible by the confrontation clause unless the witness is unavailable at trial and the defendant has a prior opportunity for cross-examination. (*Crawford, supra*, 541 U.S. at p. 59.)

Under *Crawford*, the crucial determination about whether the admission of an out-of-court statement violates the confrontation clause is whether the out-of-court statement is testimonial or nontestimonial. "[T]he court reasoned [that] the clause's express reference to 'witnesses' reflects its focus on those who ' "bear testimony," ' which typically is ' "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." ' (*Crawford, supra*, 541 U.S. 36, 51, quoting Webster, An American Dictionary of the English Language (1828).) 'An accuser who makes a formal statement to government officers,' said the court, 'bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.' (541 U.S. at p. 51.) Thus, the court explained, the constitutional text reflects an 'especially acute concern with a specific type of out-of-court statement.' (*Ibid.*)" (*People v. Cage* (2007) 40 Cal.4th 965, 977–978 [56 Cal.Rptr.3d 789, 155 P.3d 205].)

On the other hand, *Crawford* made it clear that "not all hearsay implicates the Sixth Amendment's core concerns," (*Crawford, supra*, 541 U.S. at p. 51) and, in response to a point made in the dissent, acknowledged that certain exceptions to the rule against hearsay in existence at the time the confrontation clause was originally adopted fell outside the purview of the clause because "there is scant evidence that exceptions were invoked to admit testimonial statements against the accused in a criminal case. Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy." (*Id.* at p. 56, italics & fn. omitted.)

The court in *Crawford* declined to definitively state what constitutes a "testimonial" statement for purposes of its discussion but observed: "Various formulations of this core class of 'testimonial' statements exist: '*ex parte*

in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' [citation]." (*Crawford, supra,* 541 U.S. at pp. 51–52.) Moreover, the court said, "[s]ome statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing," (*id.* at p. 52), and "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Id.* at p. 68.)

Defendant argues that the DNA report that was the basis of Dr. Cotton's testimony was a testimonial statement because it was a statement " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Crawford, supra,* 541 U.S. at p. 52.)

We have not yet had occasion to decide whether the admission of scientific evidence, like laboratory reports, constitutes a testimonial statement that is inadmissible unless the person who prepared the report testifies or *Crawford*'s conditions—unavailability and a prior opportunity for cross-examination—are met. Courts that have addressed this issue disagree as to the answer.

In the immediate aftermath of *Crawford*, some courts adopted a bright-line test based on the language in that decision about the availability of the out-of-court statements for later trial and concluded that this is the defining characteristic of whether such statements are testimonial. Thus, these courts concluded that because such evidence—fingerprint analysis, autopsy reports, serology reports, drug analysis reports, DNA reports—is prepared for possible use at a criminal trial it is testimonial and inadmissible unless the conditions for its admission, outlined in *Crawford*, have been met.

Typical of this line of cases is *State v. Caulfield* (Minn. 2006) 722 N.W.2d 304. In *Caulfield,* the Minnesota Supreme Court held that the Bureau of Criminal Apprehension (BCA) laboratory report that established a substance seized from defendant was cocaine was testimonial. "We have said that the critical determinative factor in assessing whether a statement is testimonial is

whether it was prepared for litigation. [Citations.] [¶] The BCA report was clearly prepared for litigation . . . . The BCA report was introduced by the state at trial for the purpose of proving beyond a reasonable doubt that the substance was cocaine." (*Id.* at p. 309; see *Roberts v. United States* (D.C. 2007) 916 A.2d 922 [admission of out-of-court statements of FBI forensic scientists via testimony of DNA expert violated the confrontation clause as construed by *Crawford*, but any error harmless]; *People v. Lonsby* (2005) 268 Mich.App. 375 [707 N.W.2d 610, 619] [serologist report was inadmissible because the author "would reasonably expect [that it] would be used in a prosecutorial manner and at trial" (italics omitted)]; *Las Vegas v. Walsh* (2005) 121 Nev. 899 [124 P.3d 203, 208] [Nurse's affidavit that she drew defendant's blood for a blood-alcohol test was "made for use at a later trial or legal proceeding. Thus, [its] admission, in lieu of live testimony, would violate the Confrontation Clause"]; *People v. Rogers* (N.Y.App.Div. 2004) 8 A.D.3d 888, 891 [780 N.Y.S.2d 393] [laboratory report giving results of testing of victim's blood was improperly admitted as a business record: "Because the test was initiated by the prosecution and generated by the desire to discover evidence against defendant, the results were testimonial"]; *People v. Hernandez* (N.Y.Sup.Ct. 2005) 7 Misc.3d 568 [794 N.Y.S.2d 788, 789] [latent print report inadmissible where the officer who prepared the report was unavailable because the fingerprints "were taken with the ultimate goal of apprehending and successfully prosecuting a defendant"]; *State v. Crager* (2005) 164 Ohio App. 3d 816 [2005 Ohio 6868, 844 N.E.2d 390, 398–399] [because a DNA report was testimonial and the analyst who prepared it did not testify, allowing a second analyst to testify to the contents of the report violated defendant's Sixth Amendment right to confrontation]; *State v. Miller* (2006) 208 Or.App. 424 [144 P.3d 1052, 1058] [a laboratory report that established the presence of drugs in defendant's urine and a pipe seized from his person was testimonial because it was "clearly intended to be used in a criminal prosecution to prove past events—the presence of controlled substances in defendant's urine at a specific time in the past and the presence of drug residue on a glass smoking device"].)

By contrast, a number of other courts have held that scientific evidence is not testimonial, even though it may have been prepared for possible use at trial. Some have done so on the grounds that the admission of such evidence does not implicate the abuses at which, according to *Crawford*, the confrontation clause was directed. Additionally, other courts have relied on the language in *Crawford* indicating that business records might fall outside the purview of confrontation clause concerns and held that such evidence is admissible as business or public records. Some courts also cite the practical difficulties that would ensue were *Crawford* applied to this type of evidence.

These more nuanced readings of *Crawford* reject those readings that "focus[] too narrowly on the question of whether a document may be used in litigation. This was but one of the several considerations that *Crawford* identified as bearing on whether evidence is testimonial [and n]one of these factors was deemed dispositive." (*People v. Kim* (2006) 368 Ill.App.3d 717 [859 N.E.2d 92, 94, 307 Ill.Dec. 92] [certification of Breathalyzer machine used to determine blood-alcohol content not testimonial].)

In *People v. Johnson* (2004) 121 Cal.App.4th 1409 [18 Cal.Rptr.3d 230], the trial court admitted a laboratory report at the defendant's probation revocation hearing identifying as rock cocaine a substance seized from the defendant. On appeal, the defendant argued the admission of the drug report violated his Sixth Amendment rights as construed by *Crawford*. The Court of Appeal concluded that, because "[p]robation revocation proceedings are not 'criminal prosecutions' to which the Sixth Amendment applies . . . , *Crawford*'s interpretation of the Sixth Amendment does not govern probation revocation proceedings." (121 Cal.App.4th at p. 1411.) Noting, however, that "Sixth Amendment cases . . . may provide helpful examples in determining the scope of the more limited right of confrontation held by probationers under the due process clause," the court addressed and rejected defendant's *Crawford* claim. (*Id.* at p. 1412.) ". . . Johnson misapprehends *Crawford*'s discussion of what amounts to 'testimonial' hearsay. A laboratory report does not 'bear testimony,' or function as the equivalent of in-court testimony. If the preparer had appeared to testify at Johnson's hearing, he or she would merely have authenticated the document. In [*People v. Arreola* (1994) 7 Cal.4th 1144 [31 Cal.Rptr.2d 631, 875 P.2d 736]], our Supreme Court explained: 'There is an evident distinction between a transcript of former live testimony and the type of traditional "documentary" evidence involved in [*People v. Maki* (1985) 39 Cal.3d 707 [217 Cal.Rptr. 676, 704 P.2d 743]] that does not have, as its source, live testimony. [Citation.] . . . [T]he need for confrontation is particularly important where the evidence is testimonial, because of the opportunity for observation of the witness's demeanor. [Citation.] Generally, the witness's demeanor is not a significant factor in evaluating foundational testimony relating to the admission of evidence such as laboratory reports, invoices, or receipts, where often the purpose of this testimony simply is to authenticate the documentary material, and where the author, signator, or custodian of the document ordinarily would be unable to recall from actual memory information relating to the specific contents of the writing and would rely instead upon the record of his or her own action.' (*Arreola, supra*, 7 Cal.4th at p. 1157.)" (*People v. Johnson, supra*, 121 Cal.App.4th at pp. 1412–1413.)

In *Commonwealth v. Verde* (2005) 444 Mass. 279 [827 N.E.2d 701], the Supreme Judicial Court of Massachusetts similarly held that certificates of chemical analysis identifying as cocaine a substance seized from the defendant were not testimonial. "Certificates of chemical analysis are neither discretionary nor based on opinion; rather, they merely state the results of a well-recognized scientific test determining the composition and quantity of a substance. . . . Accordingly, these drug certificates are well within the public records exception to the confrontation clause." (*Id.* at p. 705, fn. omitted.) Moreover, this evidence did not "implicate 'the principal evil at which the Confrontation Clause was directed . . . particularly its use of *ex parte* examinations as evidence of the accused.' *Crawford, supra,* [541 U.S. at p.] 50, 124 S.Ct. 1354. The documentary evidence at issue here has very little kinship to the type of hearsay the confrontation clause intended to exclude, absent an opportunity for cross-examination. [Citation.] Rather, it is akin to a business or official record, which the Court stated was not testimonial in nature." (*Commonwealth v. Verde, supra,* 827 N.E.2d at p. 706.)

In *State v. Forte* (2006) 360 N.C. 427 [629 S.E.2d 137], the Supreme Court of North Carolina, in holding that a serology report was properly admitted notwithstanding the unavailability of the analyst, also differentiated this type of evidence from that which the *Crawford* court identified as the main concern of the Sixth Amendment. "Under the Supreme Court's analysis, the reports at issue here are not testimonial. They do not fall into any of the categories that the Supreme Court defined as unquestionably testimonial. These unsworn reports, containing the results of Agent Spittle's objective analysis of the evidence, along with routine chain of custody information, do not bear witness against defendant. [Citation.] Instead, they are neutral, having the power to exonerate as well as convict. Although we acknowledge that the reports were prepared with the understanding that eventual use in court was possible or even probable, they were not prepared exclusively for trial and Agent Spittle has no interest in the outcome of any trial in which the records might be used." (629 S.E.2d at p. 143.)

In *State v. Lackey* (2005) 280 Kan. 190 [120 P.3d 332], the Kansas Supreme Court, joining those jurisdictions that have concluded that an autopsy report is not testimonial under *Crawford,* cited the practical considerations that militated against the contrary conclusion. "We believe the reason why these cases have not adopted the arguments and reasoning set forth by defendant is that it would have the effect of requiring the pathologist who performed the autopsy to testify in every criminal proceeding. If, as in this case, the medical examiner is deceased or otherwise unavailable, the State would be precluded from using the autopsy report in presenting its case, which could preclude the prosecution of a homicide case. We view this as a

harsh and unnecessary result in light of the fact that autopsy reports generally make routine and descriptive observations of the physical body in an environment where the medical examiner would have little incentive to fabricate the results." (*Id.* at pp. 351–352; see also *People v. Durio* (N.Y.Sup.Ct. 2005) 7 Misc.3d 729 [794 N.Y.S.2d 863, 869] ["[C]ourts cannot ignore the practical implications that would follow from treating autopsy reports as inadmissible testimonial hearsay in a homicide case. . . . This passage of time can easily lead to the unavailability of the examiner who prepared the autopsy report. Moreover, medical examiners who regularly perform hundreds of autopsies are unlikely to have any independent recollection of the autopsy at issue in a particular case and in testifying invariably rely entirely on the autopsy report. . . . Certainly it would be against society's interests to permit the unavailability of the medical examiner who prepared the report to preclude the prosecution of a homicide case"].)

In *State v. Craig* (2006) 110 Ohio St. 3d 306 [2006 Ohio 4571, 853 N.E.2d 621], the Supreme Court of Ohio also concluded that autopsy reports are not testimonial under *Crawford* but on the grounds that such reports are " 'quintessential business records.' [Citation.] The essence of the business record hearsay exception contemplated in *Crawford* is that such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are 'by their nature' not prepared for litigation." (*Id.* at p. 638.) Along these lines, in *People v. Brown* (N.Y.Sup.Ct. 2005) 9 Misc.3d 420 [801 N.Y.S.2d 709], the trial court denied a new trial motion based on the claim that admission of DNA laboratory reports violated the confrontation clause as construed by *Crawford.* "The notes and records of the laboratory technicians who tested the DNA samples in this case were not made for investigative or prosecutorial purposes but rather were made for the routine purpose of ensuring the accuracy of the testing done in the laboratory and as a foundation for formulating the DNA profile. [¶] . . . [T]he notes of the many laboratory personnel who conducted the four steps of DNA profiling over several days were made during a routine, non-adversarial process meant to ensure accurate analysis and not specifically prepared for trial. Because DNA testing requires multiple steps done by multiple technicians over multiple days, all of the steps in the process must be documented for the benefit of supervisors and technicians who perform subsequent testing functions." (*Id.* at pp. 711–712.)

The Supreme Court shed some further light on the question of what constitutes a "testimonial" out-of-court statement in *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*) and introduced another factor to consider on this question, pertaining to the circumstances under which the statement was made.

*Davis* consolidated two cases, *Davis v. Washington*, No. 05-5224, and *Hammon v. Indiana*, No. 05-5705. Both cases involved responses by the victims of domestic violence to police inquiries. In *Davis*, the prosecution introduced a 911 tape in which the victim, Michelle McCottry, described the attack on her by defendant to the 911 operator as it was occurring and then, after he left, answered other questions. "The police arrived within four minutes of the 911 call and observed McCottry's shaken state, the 'fresh injuries on her forearm and her face,' and her 'frantic efforts to gather her belongings and her children so they could leave the residence.' " (*Davis, supra,* 547 U.S. at p. 818 [126 S.Ct. at p. 2271].)

In *Hammon*, police responded to a domestic disturbance call and found the victim, Amy Hammon, alone on the front porch. She appeared " ' "somewhat frightened" ' " but told police that " ' "nothing was the matter." ' " (*Davis, supra,* 547 U.S. at p. 819 [126 S.Ct. at p. 2272].) Inside the house, Herschel Hammon told police there had been an argument, but it had never become physical, and it was over. Over his objection, police separated Amy from Herschel and questioned her. Based on her responses, police had her fill out and sign a battery affidavit in which she recounted that Herschel had physically assaulted her. Her affidavit was subsequently admitted against Herschel in his trial for domestic battery and probation violation as was the testimony of the officer who had questioned her. (*Id.* at pp. 820–821 [126 S.Ct. at pp. 2272–2273].)

The question before the Supreme Court was "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirements of the Sixth Amendment's Confrontation Clause." (*Davis, supra,* 547 U.S. at p. 817 [126 S.Ct. at p. 2270].) In this connection, the Supreme Court made clear that the confrontation clause applies only to testimonial hearsay statements and not to such statements that are nontestimonial. (547 U.S. at p. 824 [126 S.Ct. at p. 2274] ["A limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter"].)

On the specific question before it, the court concluded that Michelle McCottry's initial statements in response to questioning by the 911 operator were not testimonial while the statements made by Amy Hammon were. The general principle enunciated by the court was as follows: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or

prove past events potentially relevant to later criminal prosecution." (*Davis, supra*, 547 U.S. at p. 822 [126 S.Ct. at pp. 2273–2274], fn. omitted.)

In its opinion, the court emphasized the contemporaneity of McCottry's statement: "In *Davis*, McCottry was speaking about events *as they were actually happening*, rather than 'describ[ing] past events' [citation]." (*Davis, supra*, 547 U.S. at p. 827 [126 S.Ct. at p. 2276].) By contrast, "[i]t is entirely clear from the circumstances that the interrogation [of Ann Hammon] was part of an investigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged." (*Id.* at p. 829 [126 S.Ct. at p. 2278].) The statements of both Hammons "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely what a witness does on direct examination; they are inherently testimonial." (*Ibid.*, fn. & italics omitted; see *People v. Cage, supra*, 40 Cal.4th at p. 984 [among the principles to be derived from *Davis* are "the statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial," and, "statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial" (italics omitted)].)

While *Davis*, like *Crawford*, does not directly address the question of whether scientific evidence like a DNA report is testimonial, courts on both sides of the question have nonetheless found support in *Davis* for their position. (Cf. *United States v. Feliz* (2d Cir. 2006) 467 F.3d 227 [autopsy report is a nontestimonial business record "because a business record is fundamentally inconsistent with what the Supreme Court has suggested [in *Crawford* and *Davis*] comprise the defining characteristics of testimonial evidence"]; *U.S. v. Ellis* (2006) 460 F.3d 920, 926–927 [medical records establishing the presence of methamphetamine in defendant's system were nontestimonial business records because at the time the observations were made the medical professionals "like the declarant reporting an emergency in *Davis*—were 'not acting as . . . witness[es] and were 'not testifying' " (italics omitted)]; with *State v. March* (Mo. 2007) 216 S.W.3d 663, 666 [laboratory report identified substance possessed by defendant as cocaine base was testimonial under "the definitions of 'testimony' and 'testimonial' in *Crawford*, as well as the 'primary purpose' test in *Davis*"]; *State v. Kent* (2007) 391 N.J. Super. 352 [918 A.2d 626, 637] ["the 'primary purpose' of the blood certificate was . . . to preserve evidence for a future anticipated DWI prosecution"]; *State v. Miller, supra*, 144 P.3d at p. 1056 [lab reports indicating methamphetamine in defendant's urine and a glass smoking device

were requested by police "for the purpose of establishing or proving a fact in issue in the criminal prosecution"].)

 While we have found no single analysis of the applicability of *Crawford* and *Davis* to the kind of scientific evidence at issue in this case to be entirely persuasive, we are nonetheless more persuaded by those cases concluding that such evidence is not testimonial, based on our own interpretation of *Crawford* and *Davis*. For our purposes in this case, involving the admission of a DNA report, what we extract from those decisions is that a statement is testimonial if (1) it is made to a law enforcement officer or by or to a law enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial. Conversely, a statement that does not meet all three criteria is not testimonial.

Regarding the first point, as the court noted in *Crawford* it is the "involvement of government officers in the production of testimonial evidence" that implicates confrontation clause concerns. (*Crawford, supra,* 541 U.S. at p. 53.) In this respect, we use the term "agent" not only to designate law enforcement officers but those in an agency relationship with law enforcement. Regarding the third point, while the possible use of such statements at a later trial remains an important consideration, as we noted in our *Cage* decision, *Davis* "now confirms that the proper focus [about whether an out-of-court statement is testimonial] is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial." (*People v. Cage, supra,* 40 Cal.4th at p. 984, fn. 14]; see *U.S. v. Ellis, supra,* 460 F.3d at p. 926 ["A reasonable person reporting a domestic disturbance, which is what [Michelle McCottry] in *Davis* was doing, will be aware that the result is the arrest and possible prosecution of the perpetrator. [Citation.] So it cannot be that a statement is testimonial in every case where a declarant reasonably expects that it might be used prosecutorially"].)

It is the second point, the distinction drawn in *Davis* between the circumstances under which Michelle McCottry's 911 statement was made—a contemporaneous description of an unfolding event—and the questioning of Amy Hammon—the purpose of which was to "deliberately recount[], in response to police questioning, how potentially criminal past events began and progressed"—that is critical here. (*Davis, supra,* 547 U.S. at p. 830 [126 S.Ct. at p. 2278].) There is no question that the DNA report was requested by a police agency. Even if the employees of Cellmark are not themselves members of law enforcement, they were paid to do work as part of a government investigation; furthermore, it could reasonably have been anticipated that the report might be used at a later criminal trial. Yates's observations, however, constitute a contemporaneous recordation of observable events rather than the documentation of past events. That is, she recorded her observations regarding the receipt of the DNA samples, her preparation of the samples for

analysis, and the results of that analysis as she was actually performing those tasks. "Therefore, when [she] made these observations, [she]—like the declarant reporting an emergency in *Davis*—[was] 'not acting as [a] witness[];' and [was] 'not testifying.' " (*U.S. v. Ellis, supra,* 460 F.3d at pp. 926–927, italics omitted.)

We find support for this distinction even in the post-*Crawford* but pre-*Davis* decisions that concluded scientific evidence memorialized in routine forensic reports is not testimonial. A common theme that unites these decisions is that the circumstances in which these reports are generated involve the contemporaneous recordation of observable events. (See, e.g., *Commonwealth v. Verde, supra,* 827 N.E.2d at p. 705 ["Certificates of chemical analysis . . . merely state the results of a well-recognized scientific test determining the composition and quantity of the substance"]; *State v. Lackey, supra,* 120 P.3d at p. 351 [Preclusion of autopsy report because of unavailability of medical examiner would be "a harsh and unnecessary result in light of the fact that autopsy reports generally make routine and descriptive observations of the physical body . . . ."]; *People v. Brown, supra,* 801 N.Y.S.2d at p. 711 ["The notes and records of the laboratory technicians who tested the DNA samples in this case . . . were made for the routine purpose of ensuring the accuracy of the testing done in the laboratory and as a foundation for formulating the DNA profile"].) The post-*Davis* federal cases that have held such statements are not testimonial because they are business records consistent with this theme since under the Federal Rules of Evidence a business record is defined as " '[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation.' " (*United States v. Feliz, supra,* 467 F.3d at p. 234, quoting Fed. Rules Evid., rule 803(6), 28 U.S.C.; see *U.S. v. Ellis, supra,* 460 F.3d at pp. 926–927.)[12]

 Thus, we find unpersuasive those cases, cited above, holding that under *Davis* various types of forensic evidence in the form of laboratory reports were testimonial because their primary purpose was to establish a fact at trial regarding the defendant's guilt of the charged crime. (*State v. March, supra,* 216 S.W.3d 663); *State v. Kent, supra,* 918 A.2d 626; *State v. Miller, supra,* 144 P.3d 1052.) This reading of *Davis* equates a testimonial statement with any statement that it might reasonably be anticipated will be used at trial, an approach that, as we noted in *Cage, Davis* rejects. (*People v. Cage,*

---

[12] We do not hold that simply because a document qualifies as a business record that it is necessarily nontestimonial since conceivably some such document could contain historical facts.

*supra*, 40 Cal.4th at p. 984, fn. 14.) In our view, under *Davis*, determining whether a statement is testimonial requires us to consider the circumstances under which the statement was made. As we read *Davis*, the crucial point is whether the statement represents the contemporaneous recordation of observable events. But, as we have also observed, even before *Davis* a number of courts had pointed to the circumstances under which statements were made in laboratory reports and other types of forensic evidence as a reason to find those statements nontestimonial under *Crawford*, notwithstanding their possible use at trial. Those same circumstances are also present here.

For example, Yates's report and notes were generated as part of a standardized scientific protocol that she conducted pursuant to her employment at Cellmark. While the prosecutor undoubtedly hired Cellmark in the hope of obtaining evidence against defendant, Yates conducted her analysis, and made her notes and report, as part of her job, not in order to incriminate defendant. Moreover, to the extent Yates's notes, forms and report merely recount the procedures she used to analyze the DNA samples, they are not themselves accusatory, as DNA analysis can lead to either incriminatory or exculpatory results. Finally, the accusatory opinions in this case—that defendant's DNA matched that taken from the victim's vagina and that such a result was very unlikely unless defendant was the donor—were reached and conveyed not through the nontestifying technician's laboratory notes and report, but by the testifying witness, Dr. Cotton.

Thus, like the DNA analysis records in *People v. Brown, supra*, 801 N.Y.S.2d 709, Yates's notes were made "during a routine, non-adversarial process meant to ensure accurate analysis." (*Id.* at p. 712; see also *Rollins v. State* (2005) 161 Md.App. 34 [866 A.2d 926, 954] ["findings in an autopsy report of the physical condition of a decedent, which are routine, descriptive and not analytical," held nontestimonial].) In simply following Cellmark's protocol of noting carefully each step of the DNA analysis, recording what she did with each sample received, Yates did not "bear witness" against defendant. (*State v. Forte, supra*, 629 S.E.2d at p. 143.) Records of laboratory protocols followed and the resulting raw data acquired are not accusatory. "Instead, they are neutral, having the power to exonerate as well as convict." (*Ibid.*)

Accordingly, even under this earlier authority, the circumstances under which Yates's report and notes were generated, and not whether they would be available for use at trial, would have been determinative of whether they were testimonial, and pursuant to this authority they would not have been. *Davis* confirms that the critical inquiry is not whether it might be reasonably anticipated that a statement will be used at trial but the circumstances under which the statement was made. We conclude therefore that the DNA report was not testimonial for purposes of *Crawford* and *Davis*.

### c. *Harmless Error*

Even if Dr. Cotton's reliance on Yates's report violated defendant's Sixth Amendment rights as construed by *Crawford,* any error was harmless. Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681 [89 L.Ed.2d 674, 106 S.Ct. 1431].) "Since *Chapman,* we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (*Delaware v. Van Arsdall, supra,* at p. 681.) The harmless error inquiry asks: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" (*Neder v. United States* (1999) 527 U.S. 1, 18 [144 L.Ed.2d 35, 119 S.Ct. 1827].) Here the answer is yes.

Hairs found embedded in the broken nails of the victim were consistent with defendant's hair. The only item missing from the victim's apartment was the Jennings .22-caliber handgun, which defendant had sold to Tynan's boyfriend, William Jones, Jr., and which defendant was aware was in Tynan's possession. Defendant had also expressed a sexual interest in the victim during a conversation with Jones. After Tynan's murder, defendant was then seen cleaning a gun similar to the Jennings handgun. Defendant spoke of details of the murder that had not been made public and remarked that the victim "had gotten what she deserved." A ballistics expert testified that there was a good likelihood that the gun defendant used in the attempted murder of Lebouef was a Jennings .22-caliber handgun similar to the one taken from Tynan's apartment. Defendant told Winstein, his accomplice in the Lebouef attempted murder, that he killed Tynan. In light of this evidence, we conclude that any error in the admission of DNA evidence was harmless beyond a reasonable doubt.

Defendant also contends that the error infected the remaining counts against him and requires their reversal. The argument is meritless in light of the strong evidence that supports defendant's convictions of both the Lebouef and Dean offenses, which we have elsewhere recounted (see p. 577, *ante*) and need not repeat here.[13]

---

[13] Defendant also argues that the admission of Dr. Cotton's testimony was state law error because it was tantamount to the testimony by one expert as to the opinion of another. (*People v. Campos* (1995) 32 Cal.App.4th 304, 308 [38 Cal.Rptr.2d 113].) We disagree. As an expert witness, Dr. Cotton was free to rely on Yates's report in forming her own opinions regarding the DNA match. (*Ibid.* ["On direct examination, the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were the basis for that opinion"].)

#### d. Wilson *claim*

As noted, Dr. Cotton testified about the frequency of the genetic profile that matched defendant's DNA and DNA extracted from the vaginal swabs using both the interim ceiling method and the product rule; under the former, the frequency of the profile in the general population was one in 53,000; under the latter the frequency of the profile among Caucasians was one in 5.7 million. Citing *People v. Wilson, supra,* 38 Cal.4th 1237, defendant contends that the trial court committed reversible error by permitting Dr. Cotton to testify to the frequency of the profile only among Caucasians, the racial group to which defendant belongs, rather than for the three major racial and ethnic groups—Caucasian, African-American and Latino—for which DNA databases exist. He asserts, moreover, that the error is of federal constitutional dimension because it improperly lowered the prosecution's burden of proof, thus violating his federal due process rights.

We conclude that defendant has forfeited his claim by failing to specifically object on the grounds he now advances. In any event, we find the claim without merit and, even if error occurred, harmless.

Defendant concedes there was "no specific objection to this testimony," but nonetheless argues that the issue is cognizable on appeal because he "had previously objected to the admission of DNA evidence as a whole," and that this objection had been overruled. He argues in this connection that his due process objection flows from his trial court objection and is therefore preserved under *People v. Partida* (2005) 37 Cal.4th 428 [35 Cal.Rptr.3d 644, 122 P.3d 765]. Alternatively, he contends his federal constitutional claim is cognizable even without an objection. These arguments are unpersuasive.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353.) "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida, supra,* 37 Cal.4th at p. 435.)

Defendant's failure to specifically object at trial to the population frequency testimony on the ground that evidence regarding only the Caucasian database improperly suggested that the perpetrator was a member of defendant's race deprived the prosecution of the opportunity either to present

frequency evidence for the other two databases or to defend its decision not to. His failure to have lodged a specific objection on this ground is especially glaring given that Dr. Cotton testified that Cellmark ordinarily analyzes the frequency of a DNA profile for each major database, and, on cross-examination, provided the frequency of the perpetrator's genetic profile in the African-American population. Therefore, had defendant lodged a timely and specific objection, Dr. Cotton could presumably have testified to the frequency of the DNA profile for all three major populations. Alternatively, the prosecution could have defended its decision to present testimony as to the Caucasian population only by pointing out, for example, that hairs recovered from the victim's fingernails and hands indicated that the perpetrator was likely Caucasian. A timely and specific objection would also, of course, have permitted the trial court to have made a fully informed ruling.

Defendant attempts to excuse his failure by arguing that he had previously objected to admission of DNA evidence as a whole, and the specific objection at issue here was merely a subset of that larger objection that the trial court had already overruled. We are unpersuaded. Defendant refers us to his pretrial motion, argued several months before his trial, in which he objected to all DNA evidence on the grounds that DNA analysis was not generally accepted by the scientific community as required by the *Kelly/Frye* rule. (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.) In passing, defendant cited *People v. Pizarro* (1992) 10 Cal.App.4th 57 [12 Cal.Rptr.2d 436], which he described as "questioning the acceptability of statistical ratios assigned to a particular racial or ethnic data bases." Notwithstanding this brief reference, defendant did not press this objection but argued rather that "D.N.A. analysis in not admissible in California courts" because it failed to pass muster under the *Kelly/Frye* rule.

Under these circumstances, we disagree that a general attack on the scientific validity of DNA testing made months before trial encompasses the specific claim that defendant seeks to advance regarding the use of a single database to calculate the frequency of a particular genetic profile, because defendant's present claim assumes the general validity of DNA testing and questions only whether the population frequency evidence was unfairly skewed to his detriment. Defendant also fails to demonstrate that he was excused from raising this objection at trial because such objection would have been futile.

Nor do we agree that this case presents a scenario similar to the one we addressed in *Partida*. In *Partida*, a timely and specific objection to the admission of evidence was made on state law grounds. The issue was whether that objection was sufficient to preserve a federal due process claim

where the due process claim was merely "an additional legal consequence of the asserted [state] error . . . ." (*People v. Partida, supra*, 37 Cal.4th at p. 438.) Here there was no specific or timely objection from which it could be argued that the constitutional claim flowed. Accordingly, we conclude that defendant's failure to object forfeits his claim on appeal. We reject his further argument that his constitutional claim is of such magnitude that principles of forfeiture should not apply.

In any event, the claim fails on its merits. While in *Wilson* we held that, generally, the frequency of the perpetrator's genetic profile should be given as to all three major population groups, we left open the possibility that, where the perpetrator's ethnicity is established by other evidence, the frequency of that population only might be acceptable. (*People v. Wilson, supra*, 38 Cal.4th at p. 1249.) Here, the hair analysis established that hairs removed from the victim's fingernails were characteristic of Caucasians. Thus, there was other evidence before the jury suggesting that the perpetrator was Caucasian. Finally, for the reasons set forth in the preceding section, even if there were error, we conclude that the error was harmless beyond a reasonable doubt.

### C. *Penalty Phase Issues*

#### 1. *Judicial Misconduct*

Defendant contends that remarks made by the trial court were inappropriate to the solemnity of a capital case and constituted misconduct. He argues further that the court's remarks to two defense mitigation witnesses during the penalty phase undercut their credibility. He asserts that the cumulative effect of this misconduct requires reversal of the death verdict.

##### a. *Background*

The guilt phase comments of which defendant complains are as follows: Frances Hodges, a manicurist, testified for the prosecution about the type of acrylic nails she had applied to Erin Tynan's fingers, and the amount of force it would require to break such a nail. After she testified, the court remarked, "As long as we have Mrs. Hodges here, anyone want to make an appointment before recess or have her check your nails to see if you need a manicure?" Betsy Schmitt, a customer service representative for a credit reporting agency, testified about defendant's financial history. During cross-examination, the defense attorney identified an amount defendant owed to the American Express Company, and referred to the company's familiar motto, "Don't leave home without it." Before dismissing Schmitt, the court asked her if she would "agree that Mr. Geier followed the admonition not to leave home without his American Express Card?" After Victorville Police Officer Peter

Gryp testified that firemen, as well as police, were present at the Dean murder scene, the court engaged him in a brief colloquy about firemen that ended with the court asking, "Do they have a friendly dog at the station?" As Irving Root, the prosecution's pathologist, was testifying to the various wounds to Curtis James Dean's body, the prosecutor made a comment about "flesh[ing] out the picture." The trial judge responded, "No pun intended, I take it?" Shortly afterwards, the prosecutor stated, "Since the court was entertained with my pun, I will try another one. Let's bring matters to a head here."

Defendant also complains about comments the trial court made when it paused to recognize Law Day. The court noted that "the reason that we observe Law Day is because this is a country that is based on law and order and we have many rights to be thankful for and you have been exposed to the criminal justice system now for many, many months and you personally have observed many of the rights that both of the parties in this case enjoy under both the federal Constitution and the Constitution of the State of California." The court concluded its brief encomium to the American justice system by remarking, "I think we recognize that were it not for the laws that we do enjoy, we would have more incidents such as we unfortunately had the other day in Oklahoma City, a terrible tragedy, and hopefully the people responsible will be brought to justice, but they will enjoy the rights that all people have under our Constitution when they are apprehended and brought to trial."

In addition to these guilt phase comments, defendant cites two remarks made by the judge during the penalty phase to mitigation witnesses he claims denigrated their credibility. Eric Grantham, a friend of defendant during their high school years in Alabama, was questioned by the prosecutor about parties he and defendant had attended in fields outside of their Alabama town. Before excusing Grantham, the judge asked, "You said there were 20, sometimes a hundred people in the group?" The witness responded, "Yes, sir, out in the field." The judge then asked, "Was one of them by the name of Forrest Gump?"[14] Sandra Hoyt, the mother of defendant's child, testified that when she first met defendant she was married to another man, but had separated from him, and that he was involved with her sister. The judge asked, "Have you ever been asked to go on *Oprah*?" In reply, she asked, "Why do you say that?" The judge responded, "You are excused and free to go. Thank you."

Defendant also complains about the trial court's remarks at the end of the penalty phase, complimenting both counsel for their civility, which the court

---

[14] This remark possibly referred to a comment made the previous week during the examination of mitigation witness Dan Quincy, a childhood friend of defendant's. While testifying that he worked for Auburn University, defense counsel stated, "That's Auburn University where Bo Jackson and Charles Barkley went?" After the witness agreed, counsel then asked, "And Forrest Gump went to Alabama?"

contrasted to "a trial that has taken place to the west of us in Los Angeles [where the proceedings were criticized] because of the theatrical inclinations of the participants, et cetera."[15] The trial court asked the jurors to give counsel "a round of applause for the job they have done for their clients."

b. *Analysis*

The Attorney General argues that defendant has forfeited any claim of judicial misconduct because trial counsel failed to object to any of the allegedly improper remarks by the court. "As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those ground at trial." (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 [39 Cal.Rptr.3d 799, 129 P.3d 10]; see also *People v. Melton* (1988) 44 Cal.3d 713, 753 [244 Cal.Rptr. 867, 750 P.2d 741].) Defendant argues that this claim involves "the due administration of justice" and may therefore be raised on appeal even without an objection at trial. In support, he cites *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237 [42 Cal.Rptr.2d 440].

*Catchpole* involved the trial of a female plaintiff's claim of sexual harassment, among other causes of action, in which the trial judge displayed a pervasive gender bias that was alternately " 'courtly and patronizing or harsh and reprimanding.' " (*Catchpole v. Brannon, supra*, 36 Cal.App.4th at p. 251.) In reversing the judgment for the defendant and remanding the case for trial before a different judge, the reviewing court declined to apply forfeiture principles to the plaintiff's bias claim even though she had not objected to the trial court's improper comments. The reviewing court posited that she may have refrained from objecting because of the risk of offending the trial judge. Moreover, "doubt whether the problem could be cured by objection might discourage the assertion of even meritorious claims." (*Id.* at p. 244.) Additionally, forfeiture would "have the unjust effect of insulating judges from accountability for bias." (*Ibid.*) The reviewing court concluded that the plaintiff's failure to object in the case before it was excused because of the "public interest" and "administration of justice" factors inherent in the issue of judicial gender bias. (*Ibid.*)

The case before us does not involve a claim of judicial gender bias or any other kind of invidious bias by the trial court. *Catchpole* is, therefore, inapposite and does not excuse defendant's failure to object to the trial court's allegedly improper remarks. Defendant therefore has forfeited any claim of judicial misconduct. Even if the claim was not forfeited, it is without merit.

---

[15] Evidently the court was referring to the highly publicized O.J. Simpson criminal trial, which was taking place at the same time as defendant's trial.

Defendant suggests that the trial judge's jocular manner with prosecution witnesses during the guilt phase set a tone lacking the degree of solemnity appropriate to a capital case, and may have affected the jury's penalty phase deliberations in a manner adverse to him. He cites *United States v. Young* (1985) 470 U.S. 1, 10 [84 L.Ed.2d 1, 105 S.Ct. 1038], for the principle that "the trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding." (See also *People v. Sturm, supra,* 37 Cal.4th at p. 1238 [noting that attempts at judicial humor are "always a risky venture during a trial for a capital offense"].)

We disagree. Considered in the context of this lengthy trial, the four fleeting remarks during the guilt phase of which defendant complains were innocuous and did not constitute judicial misconduct. Moreover, we find nothing improper in the trial court's Law Day comments, the apparent purpose of which was to impress upon the jurors the larger meaning of their participation in the justice system, nor in the trial court's compliments to counsel for the civil manner in which they conducted themselves at trial. None of these comments had any tendency to bolster the prosecution or denigrate the defense, nor does defendant cite anything in the record to support his speculation that these remarks had a negative effect on the jury's penalty phase deliberations.

On the other hand, we agree that the trial court's "Forrest Gump" and "*Oprah*" remarks during the penalty phase were improper, even if no impropriety was intended. Associating one mitigation witness, Eric Grantham, with a dim-witted fictional character and suggesting that the personal life of Sandra Hoyt, another mitigation witness, was the stuff of tabloid television could have been perceived by jurors as derogatory comments on the credibility of those witnesses. (*People v. Sturm, supra,* 37 Cal.4th at p. 1238 ["A trial court commits misconduct if it ' "persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge" ' "].) Nonetheless, even if improper, these brief, isolated comments "fall short of the intemperate or biased judicial conduct which warrants reversal." (*People v. Melton, supra,* 44 Cal.3d at p. 754 [trial court's comment to defense clinical psychologist Dr. Podboy whether it could call him "John Boy for short," and its remark "permission granted" in response to a hypothetical that involved shooting the public defender, "while unfortunate" were not misconduct requiring reversal].)[16]

---

[16] Defendant argues that where a judge sets an improper tone before penalty deliberations, as alleged here, the test for reversal should be whether a reasonable person would lack confidence in the fairness of the proceedings. (*Hernandez v. Paicus* (2003) 109 Cal.App.4th 452, 461 [134 Cal.Rptr.2d 756].) The court in *Hernandez* noted, however, that courts should

### 2. *Denial of Defense Penalty Phase Instructions*

Defendant contends that the trial court erred by declining to give four special defense instructions and that the errors, individually and cumulatively, violated his right to a fair penalty determination under the Eighth and Fourteenth Amendments to the federal Constitution. We reject these claims.

First, defendant contends the trial court erred when it declined to instruct the jury that the absence of a mitigating factor cannot be considered a factor in aggravation. In cases where, as here, the jury was instructed with CALJIC No. 8.85, we have consistently rejected this particular claim of error. "[A]s we have held, 'a reasonable juror could not have believed . . . that the absence of mitigation amounted to the presence of aggravation.' " (*People v. Vieira* (2005) 35 Cal.4th 264, 299 [25 Cal.Rptr.3d 337, 106 P.3d 990] [rejecting claim that trial court "should have instructed the jury . . . that absence of a mitigating factor could not be considered an aggravating factor"]; see *People v. Berryman* (1993) 6 Cal.4th 1048, 1100 [25 Cal.Rptr.2d 867, 864 P.2d 40]].)

Next, defendant contends that the trial court erred when it refused to instruct on lingering doubt. As defendant acknowledges, such instruction is required neither by state nor federal law (*People v. Lawley* (2002) 27 Cal.4th 102, 166 [115 Cal.Rptr.2d 614, 38 P.3d 461]), and we have consistently held that this concept is sufficiently covered in CALJIC No. 8.85. (*People v. Lawley*, at p. 166; *People v. Sanchez* (1995) 12 Cal.4th 1, 77–78 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) Defendant's arguments to the contrary notwithstanding, we see no reason to reexamine those principles in the present case.

Defendant also contends that the trial court erred when it declined to give his special instruction on sympathy. "We have consistently held, however, that the trial court does not have to give such an instruction" (*People v. Champion* (1995) 9 Cal.4th 879, 943 [39 Cal.Rptr.2d 547, 891 P.2d 93]), and that such instruction is "duplicative of an instruction given by the trial court that the jury could consider '[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspects of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.' " (*People v. Hines* (1997) 15 Cal.4th 997, 1068–1069 [64 Cal.Rptr.2d 594, 938 P.2d 388]; see CALJIC No. 8.85.) Defendant's arguments do not persuade us that these principles should not apply equally here.

---

apply this lower standard when "the appearance of judicial bias and unfairness colors the entire record." (*Ibid.*) Self-evidently, that is not the case here.

Finally, defendant contends that the trial court erred when it declined to instruct the jury that it could impose life without the possibility of parole even in the absence of any mitigating factors. As defendant acknowledges, we have previously rejected this instruction on the ground, that under CALJIC No. 8.88, which was given here, "[n]o reasonable juror would assume he or she was required to impose death despite insubstantial aggravating circumstances, merely because no mitigating circumstances were found to exist." (*People v. Johnson* (1993) 6 Cal.4th 1, 52 [23 Cal.Rptr.2d 593, 859 P.2d 673].) We adhere to this view.

We conclude that, under settled precedent, the trial court did not err in declining to instruct the jury with the special defense instructions. Necessarily, we find no constitutional violations or any prejudice, singular or cumulative, requiring reversal of the penalty determination.

### 3. *Improper Denial of Automatic Motion to Modify the Verdict*

Defendant contends that, in ruling upon his automatic motion to modify the verdict (§ 190.4, subd. (e)), the trial court impermissibly deferred to the jury's verdict, and improperly failed to separately consider each of the two death sentences. He contends that these errors violated various constitutional provisions and require remand for reconsideration of his motion.

Section 190.4, subdivision (e) states, in relevant part: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding . . . . In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

"In ruling on the motion, the trial court must independently reweigh the evidence of aggravating and mitigating factors presented at trial and determine whether, in its independent judgment, the evidence supports the death verdict. . . . On appeal, we independently review the trial court's ruling after reviewing the record, but we do not determine the penalty de novo." (*People v. Steele* (2002) 27 Cal.4th 1230, 1267 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

Defendant claims that the trial court failed to engage in the required independent review, but concedes that the trial court framed its analysis in light of the applicable independent review standard. The court observed: "The trial judge has a duty to review the evidence to determine whether in his independent judgment the weight of the evidence supports the jury's verdict . . . . [¶] In determining whether in his independent judgment the weight of the evidence supports the verdict, the judge is required to assess the credibility of the witnesses, to determine the probative force of the testimony and weigh the evidence."

In its review of the evidence as to each count, the trial court cited specific evidence that had led it to "agree with the conclusion reached by the jury" that all counts, special circumstances and special allegations had been established beyond a reasonable doubt. The trial court also applied the standard of independent review to the penalty phase evidence—again, citing specific evidence in mitigation and aggravation—and concluded that "the evidence in aggravation is so substantial when compared to the evidence in mitigation to support the selection of the death penalty as the appropriate punishment and that this is overwhelmingly supported by the weight of the evidence."

The trial court's remarks demonstrate that it understood and applied the independent review standard. (See *People v. Smith* (2003) 30 Cal.4th 581, 640 [134 Cal.Rptr.2d 1, 68 P.3d 302] ["In this case, the court's preliminary remarks show it understood [its] duty precisely"].) Contrary to defendant's suggestion that the trial court's invocation of the independent standard was rote, our reading of the record persuades us that "the court carefully and conscientiously performed its duty under section 190.4." (*People v. Steele, supra,* 27 Cal.4th at p. 1268.)

We also find no merit in defendant's other claim that the trial court failed to consider the Tynan and Dean death sentences separately. As noted, the trial court considered the evidence that supported defendant's conviction of each count separately in its analysis of the guilt phase verdicts. As for the penalty phase, defendant does not suggest, nor does the record reveal, that he presented mitigating evidence that might have applied to one case but not the other. Thus, defendant's claim must be rejected.

### 4. *Constitutionality of Lying-in-wait Special Circumstance*

Defendant contends that California's lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) fails to adequately narrow the class of persons

eligible for the death penalty and, therefore, violates the Eighth Amendment. Prior decisions of this court have consistently rejected this claim (e.g., *People v. Carpenter* (1997) 15 Cal.4th 312, 419 [63 Cal.Rptr.2d 1, 935 P.2d 708]), and we see no reason to reexamine that conclusion.

### 5. *Intercase Proportionality*

Defendant contends that California's failure to conduct intercase proportionality review of death sentences violates the Eighth and Fourteenth Amendments. "Neither the federal nor the state Constitution requires intercase proportionality review" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1042 [108 Cal.Rptr.2d 291, 25 P.3d 519]), and we have consistently rejected this argument. (*People v. Panah, supra*, 35 Cal.4th at p. 500; *People v. Lewis* (2001) 26 Cal.4th 334, 394–395 [110 Cal.Rptr.2d 272, 28 P.3d 34] ["We also reject defendant's claim that because it does not require intercase proportional review, the California death penalty statute ensures arbitrary, discriminatory, or disproportionate impositions of death sentences"].)

### 6. *Constitutional Challenges to the Death Penalty Statute*

Defendant mounts a number of challenges to the death penalty statute (§ 190.2) that our prior decisions have considered and consistently rejected. He provides no persuasive reason for us to reexamine those conclusions. We again therefore conclude that: (1) the statute is not unconstitutional because it does not assign a burden of proof as to the existence of aggravating factors; does not require the jury to find that circumstances in aggravation outweigh circumstances in mitigation beyond a reasonable doubt; that death is an appropriate sentence; or require that the jury be so instructed (*People v. Ramirez, supra*, 39 Cal.4th at p. 475; *People v. Panah, supra*, 35 Cal.4th at p. 499; *People v. Stitely, supra*, 35 Cal.4th at p. 573); (2) nor is the statute unconstitutional because jurors are not required, and were not instructed, to unanimously agree on the aggravating factors (*People v. Stitely, supra*, 35 Cal.4th at p. 573); (3) nor is the statute deficient because it does not require the jury be instructed on the presumption of life, nor was there any error because the jury was not so instructed. (*People v. Young* (2005) 34 Cal.4th 1149, 1233 [24 Cal.Rtpr.3d 112, 105 P.3d 487].)

### 7. *CALJIC No. 8.88*

Defendant contends that CALJIC No. 8.88, which defines the scope of the jury's sentencing discretion, is constitutionally deficient because (1) the phrase "so substantial" used to compare aggravating factors with the mitigating factors is impermissibly vague; (2) fails to inform the jury that its central

determination is whether death is an appropriate, and not merely an authorized, penalty; (3) fails to instruct the jury that, if they determine the factors in mitigation outweigh the factors in aggravation, they are required to return a sentence of life without possibility of parole; and, (4) fails to instruct the jury that defendant does not have the burden to persuade it that the death penalty was inappropriate.

We have consistently rejected each of these challenges to the instruction. (*People v. Carter* (2003) 30 Cal.4th 1166, 1226 [135 Cal.Rptr.2d 553, 70 P.3d 981] [rejecting claim that "the 'so substantial' standard employed here for comparing aggravating and mitigating factors was unconstitutionally vague, conducive to arbitrary and capricious decisionmaking, and created an unconstitutional presumption in favor of death"]; *People v. Smith* (2005) 35 Cal.4th 334, 370 [25 Cal.Rptr.3d 554, 107 P.3d 229] [" 'By advising that a death verdict should be returned only if aggravation is "so substantial in comparison with" mitigation that death is "warranted," the instruction clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty' "]; *People v. Taylor* (2001) 26 Cal.4th 1155, 1181 [113 Cal.Rptr.2d 827, 34 P.3d 937] [CALJIC No. 8.88 is not deficient because it does not direct the jury that it is required to return a sentence of life without parole if it concludes the mitigation circumstances outweigh the aggravation circumstances "in light of other language in this instruction, allowing a death verdict only if aggravating circumstances outweighed mitigating ones"]; *People v. Smith, supra,* 35 Cal.4th at pp. 370–371 [CALJIC No. 8.88 is not deficient because it does not inform the jury of the burden of persuasion because "[t]here is no penalty phase burden of persuasion"].) We adhere to our conclusions.

### 8. *CALJIC No. 8.85*

Defendant contends that CALJIC No. 8.85, the standard instruction regarding the section 190.3 factors in mitigation and aggravation that are to be considered in determining whether to impose a death sentence or life without parole, is constitutionally infirm because (1) the "circumstances of the crime" factor in aggravation (§ 190.3, factor (a)) as applied via the instruction results in the arbitrary and capricious imposition of the death penalty; (2) the trial court failed to delete inapplicable sentencing factors from the instruction; (3) the instruction fails to inform the jury that mitigating factors are relevant solely for mitigation; (4) the use of adjectives in the instruction such as "extreme" and "substantial" erect a barrier to the jury's consideration of mitigation, and; (5) the instruction failed to require written findings by the jury regarding the aggravating factors.

We have consistently rejected each of these challenges to the instruction. (*People v. Smith, supra*, 35 Cal.4th at p. 373 ["Neither the breadth of the 'circumstances of the crime' in factor (a) of section 190.3, nor disagreement about what circumstances are aggravating, results in arbitrary and capricious application of the death penalty"]; *Tuilaepa v. California* (1994) 512 U.S. 967, 975 [129 L.Ed.2d 750, 114 S.Ct. 2630] [rejecting Eighth Amendment challenge to § 190.3, factor (a)]; *People v. Stitely, supra*, 35 Cal.4th at p. 574 ["[T]he trial court did not err in failing to . . . delete assertedly inapplicable sentencing factors"]; *People v. Ramos* (2004) 34 Cal.4th 494, 530 [21 Cal.Rptr.3d 575, 101 P.3d 478] [rejecting claim that instruction is deficient because it does not inform jury that mitigating factors are relevant only to mitigation because this court has "considered and rejected the identical contention in several recent cases, and no evidence suggests the jury was unable to properly apply the instruction"]; *People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130] ["Nor are the factors a jury may consider in determining penalty, such as the circumstances of the crime, the defendant's age, or the use of the adjectives 'extreme' and 'substantial,' unconstitutionally vague"]; *People v. Stitely, supra*, 35 Cal.4th at p. 574 ["The trial court did not prevent meaningful appellate review by failing to require a written statement of the jury's findings and reasons for imposing a death sentence"].) We adhere to these conclusions.

### 9. *International Law*

Defendant contends that his death sentence violates international law. We have consistently rejected this claim. (*People v. Ramirez, supra*, 39 Cal.4th at p. 479; *People v. Panah, supra*, 35 Cal.4th at pp. 500–501; *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Ghent* (1987) 43 Cal.3d 739, 778–779 [239 Cal.Rptr. 82, 739 P.2d 1250].)

### 10. *Effect of Errors*

Defendant contends that the cumulative effect of error requires reversal of both guilt and penalty phase proceedings. However, as defendant "has demonstrated few errors, and we have already found such errors or possible errors harmless, either individually or cumulatively, 'we likewise conclude that their cumulative effect does not warrant reversal of the judgment.' (*People v. Panah, supra*, 35 Cal.4th at pp. 479–480.)" (*People v. Jablonski, supra*, 37 Cal.4th at p. 837.)

Defendant also argues that, were we to set aside any conviction or special circumstance finding, the entire matter must be remanded for a new sentencing hearing. As we have not done so, there is no basis for remand.

### III. CONCLUSION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring.—I concur in the decision affirming defendant's convictions and imposition of the death penalty, but write separately to address the admission of DNA match testimony that was based on analysis by a nontestifying laboratory technician. I agree with the majority that the technician's notes and report were not "testimonial" hearsay and hence their introduction through the prosecution's DNA expert did not violate defendant's confrontation rights under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). I reach that conclusion, however, only on narrow, fact-specific grounds; I would not hold or imply that all laboratory reports are nontestimonial. Unlike the majority, moreover, I would not hold that any error in admitting the DNA match evidence was harmless beyond a reasonable doubt.

As the majority explains, the prosecution tied defendant to the rape and murder of Erin Tynan partly through the expert testimony of Dr. Robin Cotton, laboratory director for Cellmark. Cotton testified that DNA taken from Tynan's vagina matched defendant's DNA sample and that the frequency of the matched DNA profile was between one in 53,000 and one in 5.7 million, depending on the population statistics used. Cotton did not, however, perform or personally supervise the laboratory analysis leading to the match. That was done by Cellmark technician Paula Yates, who was not called as a witness. In testifying to the procedures used and the analytical results, Cotton relied entirely on Yates's forms, notes and report and at points quoted or paraphrased statements Yates had made in those written records, thus introducing them into evidence. The truth of Yates's written statements regarding the steps she had taken to compare the various DNA samples was obviously critical to Cotton's opinion that defendant's DNA profile matched that of semen found in the victim's vagina, and the jury was not instructed that Yates's statements were not to be considered for their truth.

The prosecution thus introduced, through Cotton, hearsay statements of a declarant—the technician, Paula Yates—who was not present at trial and whom defendant had had no prior opportunity to cross-examine. If those statements were testimonial, their admission violated defendant's rights under the Sixth Amendment's confrontation clause. (*Crawford, supra,* 541 U.S. at p. 59.)

The majority gives two reasons for holding Yates's notes and report were nontestimonial. First, Yates's written record of her laboratory procedures

"constitute[s] a contemporaneous recordation of observable events rather than the documentation of past events." (Maj. opn., *ante*, at p. 605.) Second, the majority relies on the broader set of circumstances surrounding the production and use of Yates's records and notes: "Yates's report and notes were generated as part of a standardized scientific protocol that she conducted pursuant to her employment at Cellmark" and "merely recount the procedures she used to analyze the DNA samples," while "the accusatory opinions in this case—that defendant's DNA matched that taken from the victim's vagina and that such a result was very unlikely unless defendant was the donor—were reached and conveyed not through the nontestifying technician's laboratory notes and report, but by the testifying witness, Dr. Cotton." (*Id.* at p. 607.)

I agree with the majority's second approach, reliance on the entire set of facts surrounding the production and use of Yates's hearsay statements. I am not persuaded that every part of every laboratory report could properly be deemed nontestimonial simply because it did not recount past criminal events. A report's accusatorial conclusion that a defendant's fingerprints or DNA matched a latent print at the scene or an evidentiary blood or semen sample, for example, might be considered testimonial under some circumstances even though it did not recount past criminal events.

Having concluded that Dr. Cotton's DNA match testimony did not violate *Crawford*, a conclusion with which I agree, the majority goes on to assert, gratuitously, that any error in its admission would be harmless under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (Maj. opn., *ante*, at pp. 606–607.) I cannot agree. The other evidence tying defendant to Tynan's rape and murder was mainly circumstantial and was not definitive: Defendant expressed a sexual interest in Tynan, hairs *consistent* with defendant's were found at the scene, the gun defendant had earlier sold to William Jones, Jr., was missing from the victim's apartment, and defendant possessed and may have used a *similar* gun later. Defendant's girlfriend's roommate, a regular amphetamine user, testified that defendant had made detailed statements about the manner of Tynan's death before she (the roommate) read about it in the newspaper, but admitted on cross-examination that she did not read the newspaper every day and in fact did not know if any articles had appeared prior to her conversation with defendant. An accomplice of defendant's in another murder, a methamphetamine user testifying under a grant of immunity, stated that defendant had told him he killed Tynan but gave no details. In contrast to the circumstantial evidence and the highly impeachable hearsay evidence of defendant's statements, Dr. Cotton's DNA match testimony showed defendant's involvement in the crime directly and scientifically. Where, as here, the other evidence of guilt was far from conclusive, finding

*beyond a reasonable doubt* that evidence of a DNA match with semen found in the victim's vagina had no effect on the verdict is, in my view, unsupportable.

In all other respects I concur in the majority opinion.